**JOHN I. HAY CO.**

v.

**THE ALLEN B. WOOD.**

**No. 1692.**

United States District Court,
E. D. Louisiana, New Orleans Division.

May 25, 1954.

**WRIGHT, District Judge.**

On February 3, 1949, barges owned or chartered by libelant broke loose from their moorings at Bisso Landing in the Mississippi River near New Orleans and drifted down the river, causing damage to themselves and to property of third persons not parties herein. Claimant, owner of the tug Milne Bay, charged by libelant with causing the damage, has impleaded the operator of the Bisso Landing. The case having come on for trial, and the court, having considered the evidence adduced and the law applicable thereto, makes the following findings of fact and conclusions of law.

### Findings of Fact

1. Libelant, John I. Hay Company, is, and at all times material hereto, was a corporation organized under the laws of the State of Delaware, and owner of the steel barges known as JIH 103, JIH 22 and JIH 29. Libelant also at all material times was bareboat charterer and owner pro hac vice of the steel barge OBL 822.

2. At all material times, the towboat Milne Bay (now named Allen B. Wood) was a large pusher-type river towboat, owned and operated by Martin Oil Service, Inc., appearing herein as claimant of The Milne Bay and as petitioner in impleader.

3. On February 3 and 4, 1949, and for some years prior thereto, New Orleans Coal & Bisso Towboat Company (William A. Bisso, Jr., receiver) maintained, in the Mississippi River at New Orleans, at the foot of Walnut Street, a service for the mooring of barges and of tows. This is and was referred to as the Bisso Landing. It included watchman service twenty-four hours a day, the use of certain mooring facilities, the placing of whatever lights were necessary on the moored equipment at night, and various other minor services. For this service New Orleans Coal & Bisso Towboat Company collected from the various river operators, including the libelant and claimant, who used the service the charge of $1 per day for empty and $2 per day for loaded barges. This service was widely

Terriberry, Young, Rault & Carroll, Benjamin W. Yancey, New Orleans, La., for libelant.

Deutsch, Kerrigan & Stiles Francis Emmett, New Orleans, La., for claimant.

Phelps, Dunbar, Marks & Claverie, John W. Sims, Charles E. Dunbar, Jr., New Orleans, La., for respondent-impleaded.

used by river operators, including both John I. Hay Company, libelant, and Martin Oil Service, Inc., owners and operators of The Milne Bay.

4. The mooring location operated as a landing by New Orleans Coal & Bisso Towboat Company consisted, among other things, of a large floating drydock, which was securely and permanently, or semi-permanently, fixed to shore. This drydock served as the principal docking facility, and all vessels using the Bisso Landing either tied to this drydock or tied to vessels already tied thereto.

5. On February 3, 1949, there were moored to the drydock, one behind the other, and in this order from upstream: —Ringfree 71, OBL 822, JIH 103, JIH 22, and, outboard of the JIH 22, the JIH 29. The Ringfree 71 was tied up with its bow flush to the drydock, and had been securely tied up in that position for some 21 days prior to February 3, 1949. All these barges were heavily loaded. In the position described, all of the barges were then and there safely and properly moored in a customary safe, proper and seaworthy manner and position. In order to prevent the flotilla of barges from having any swinging or yawing motion, there was a wire cable running from the after or downstream end of The Ringfree 71 to shore, and there were two manila lines from the inboard downstream Hay barge, the JIH 22, to shore. The only purpose served by this cable and these lines was to prevent any swinging or yawing motion. The weight and strain of the flotilla was intended to be borne and was in fact borne by the drydock and not by these lines to shore. In the position in which they were, the barges were standing approximately 75 feet offshore.

6. At about 11:30 on the morning of February 3, 1949, the towboat Milne Bay, with a tow, came to the Bisso Landing. She tied off her tow at the drydock and then proceeded to "drill out" or remove The Ringfree 71 from the tandem of barges by casting off the forward moorings making that barge fast to the drydock, and then casting off that barge's stern moorings by which the remainder of the flotilla, the Hay barges, had been held to The Ringfree 71. In this operation of drilling out or removing The Ringfree 71 from the flotilla, the towboat Milne Bay had the assistance and participation of Bisso's day watchman. Deckhands of The Milne Bay and Bisso's day watchman removed from The Ringfree 71 the cable which had been running from her to shore, and placed that cable on the forward inboard corner of the OBL 822.

7. Having drilled out or removed The Ringfree 71 from the flotilla, The Milne Bay did not move the Hay barges back up to the drydock into the position previously occupied by The Ringfree 71, and did not tie the Hay lead barge flush to the drydock in the same position in which The Ringfree 71 had previously been. On the contrary, The Milne Bay left the four Hay barges in an obviously dangerous and exposed condition, secured only by lines to the river bank, consisting of the cable previously on The Ringfree 71 but removed to the Hay barge OBL 822, and the two manila lines from the downstream barge of the Hay flotilla to shore. These lines, about 75 feet long, were not intended to take and could not take the entire strain of the flotilla. The flotilla, left unsecured to the drydock, and with only these slack lines to shore, was not properly moored, particularly in view of the current and the eddy existing in the river at that point.

8. Having placed The Ringfree 71 in her tow at the Bisso Landing, The Milne Bay then left her tow there and went, without tow, down the river to pick up various other barges.

9. After The Milne Bay departed, Bisso's day watchman unsuccessfully attempted to board Hay's barges to check their mooring lines and to run additional lines to the shore, since he was of the opinion that the Hay barges were not adequately moored.

10. Immediately after attempting to board the Hay barges, Bisso's day watchman reported to the tug dispatcher then in charge of the Bisso Landing, that in his opinion the Hay barges were inadequately secured to the east bank and that he had been unable to board those vessels to put out additional lines. Bisso's tug dispatcher took no steps to run additional lines to the Hay barges or to shift them to another berth.

11. Two tugs belonging to Bisso were available at the nearby United Fruit Company wharf and could have shifted the Hay barges, or more adequately secured them, in half an hour. Bisso's tug dispatcher also knew that Hay and Martin had offices in New Orleans and could have called either of those companies and informed them of the situation of the Hay barges. He did not. Bisso's tug dispatcher also knew that The Milne Bay would return to the Bisso Landing, but he failed to request The Milne Bay to shift the Hay barges when she did return.

12. The Milne Bay returned with other barges to her tow at the Bisso Landing at about 7:30 P.M. on the same day. The Hay barges were still in the same dangerous and insecure position, but The Milne Bay did nothing to resecure them.

13. At about midnight February 3–4, the Hay barges OBL 822, JIH 103, JIH 22 and JIH 29 broke adrift from their insecure mooring, brushed lightly against The Milne Bay and drifted free down the Mississippi River. The Milne Bay, still lying at the Bisso Landing because of fog, observed the free drifting barges but made no effort to save them or to recover them. The barges drifted down the river into the harbor and, in the fog, collided with various other vessels and docks, doing altogether $25,155.85 damage to the property of third parties.

14. John I. Hay Company, under a non-prejudicial stipulation, has paid to the various third parties whose property sustained damages as a result of these occurrences, the total sum of $25,155.85. By the stipulation, the libelant, John I. Hay Company, has been placed in the same position, as against claimant and as against respondent impleaded, with regard to the settlements as libelant is or might be with regard to the physical damages claimed by it to have been suffered by its own and its chartered equipment as a result of the events which are the subject of this litigation.

15. In addition to the damage done by the drifting barges to the property of third parties, Hay also sustained damage in the way of physical damage to the barges, plus incidental expenses and detention, all as a result of the incidents which are the subject of the litigation.

Conclusions of Law

1. This court has jurisdiction of this action and venue is properly laid in the Eastern District of Louisiana. 28 U.S. C. § 1333.

2. John I. Hay Company complied with the requirement of its Coast Guard certificates of inspection on barges JIH 22 and JIH 29, the barges containing petroleum products, by using New Orleans Coal & Bisso Towboat Company's landing, which undertook to provide watchman service for the Hay barges. There was no obligation or duty on the part of John I. Hay Company to have watchmen actually aboard any of these barges.

3. It is clearly shown by the evidence in this case, and is well established by the jurisprudence, that, where at a landing such as that operated by New Orleans Coal & Bisso Towboat Company, a tug or towboat disturbs a nest of barges in order to drill out or remove one of the barges, the tug or towboat is under the obligation and duty properly to resecure the remainder of the barges. Osterhoudt v. Federal Sugar Refining Co. (The Universe), 2 Cir., 22 F.2d 475, 1928 A. M.C. 103; The Norwich Victory, D.C. E.D.Pa., 77 F.Supp. 264, 1948 A.M.C. 879, affirmed per curiam, United States v. Dump Scows No. 116, No. 120 and No.

122, 3 Cir., 175 F.2d 556, 1949 A.M.C. 2040; New York Trap Rock Corp. v. Tug Portchester, D.C.E.D.N.Y., 1944 A.M.C. 211; Hanrahan v. Russell Dry Docks, Inc. (Wilson-Wyomissing), D.C.E.D. N.Y., 1931 A.M.C. 1011; Hanfield v. Cornell Steamboat Co. (David Harum), D.C. E.D.N.Y., 1925 A.M.C. 1170.

**4.** The Milne Bay failed in this duty to resecure the Hay flotilla, and her failure was a contributing proximate cause of the flotilla going adrift. She left the four Hay barges in a position of obvious danger. She failed to move the Hay barges back up to the drydock after drilling out or removing The Ringfree 71, and failed to tie the Hay barges to the drydock. She left them improperly secured, where, before she had removed The Ringfree 71, the Hay barges had in fact been securely and properly moored. The danger and exposure in which The Milne Bay left the Hay barges was obvious. She left the barges secured only by breast and stern lines, in a position where they were obviously subject to yawing in the current and eddies then existing, and were subject to the obvious danger of eventually breaking adrift.

**5.** Bisso was a wharfinger and bailee for hire of Hay's barges moored at its landing, and was responsible for caring for those vessels after they were committed to its custody. Commercial Molasses Corp. v. New York Tank Barge Corp., 1941, 314 U.S. 104, 110, 62 S.Ct. 156, 86 L.Ed. 89; Orrell v. Wilmington Iron Works, 4 Cir., 1950, 185 F.2d 181, 183; Burns Bros. v. Long Island R. Co., 2 Cir., 1949, 176 F.2d 406, 409; Waldie v. Steers Sand & Gravel Corp., 2 Cir., 1945, 151 F.2d 129, 130; The Santa Barbara, 4 Cir., 1924, 299 F. 147, 150.

**6.** Among Bisso's duties as wharfinger and bailee for hire respecting Hay's barges were those of re-mooring the barges properly, if necessary, after The Milne Bay drilled out The Ringfree 71, and of maintaining proper moorings on the barges thereafter. Bisso's negligent failure to perform these duties properly was a contributing proximate cause of the Hay barges going adrift. Burns Bros. v. Long Island R. Co., 2 Cir., 1949, 176 F.2d 406, 409; Puget Sound Tug & Barge Co. v. Olympic Forest Products Co., D.C.W.D.Wash.1937, 21 F. Supp. 940, 941.

**7.** Bisso, whether or not a bailee, was negligent in failing to take available remedial measures to safeguard the Hay barges when its employees became aware that those vessels were not adequately secured. Roah Hook Brick Co. v. Erie R. Co., 2 Cir., 1950, 179 F.2d 601, 604; C. F. Harms Co. v. Erie R. Co., 2 Cir., 1948, 167 F.2d 562, 563; The Santa Barbara, 4 Cir., 1924, 299 F. 147, 150; Clarkson Coal & Dock Co. v. Northern Lakes S. S. Co., 8 Cir., 1918, 251 F. 181; The Chancellor, 2 Cir., 1929, 30 F.2d 227, 228.

8. Bisso's negligent failure to take such available remedial measures was also a contributing proximate cause of the Hay barges breaking adrift. Roah Hook Brick Co. v. Erie R. Co., 2 Cir., 1950, 179 F.2d 601, 604; Orrell v. Wilmington Iron Works, 4 Cir., 1950, 185 F.2d 181, 185; Tucker v. Reading Co., 2 Cir., 1942, 127 F.2d 527, 528.

**9.** Libelant is entitled to recover of and from The Milne Bay and the Receiver of the New Orleans Coal & Bisso Towboat Company the damages sustained by its own barges, with interest as to those damages from February 4, 1949; and is also entitled to recover $25,155.85, the amount paid to the third parties whose property was damaged by the drifting barges, with interest as to that item from February 3, 1950, the date of the payments.

Decree in accord with these findings.