**STAUFFER CHEMICAL COMPANY,**
Appellant,

v.

**W. D. BRUNSON, d/b/a Brunson Construction Company, Appellee.**

**No. 23197.**

United States Court of Appeals
Fifth Circuit.
June 28, 1967.

---

George F. Wood, Mobile, Ala., Seymour Simon, New York City, for appellant, Stauffer Chemical Co., Pillans, Reams, Tappan, Wood & Roberts, Mobile, Ala., and Richard T. Graham, New York City, of counsel.

Alex F. Lankford, III, Mobile, Ala., for appellee, Hand, Arendall, Bedsole, Greaves & Johnston, Mobile, Ala., of counsel.

Before RIVES, GEWIN and GOD-BOLD, Circuit Judges.

GEWIN, Circuit Judge:

Admiralty actions were instituted in the United States District Court for the Southern District of Alabama, pursuant to 28 U.S.C. § 1333, against W. D. Brunson d/b/a Brunson Construction Company by Sioux City and New Orleans Barge Lines, Inc. for negligent discharge of its Barge 1515 which caused the barge to sink, and by Stauffer Chemical Company

for negligent discharge of the barge which resulted in damage to Stauffer's cargo of sulphur and for breach of contract. The actions were consolidated and the district court held that Brunson was not negligent with regard to the discharge of the barge, nor was he liable for the damage to the cargo of sulphur under the contract. Stauffer appeals from the decision of the court regarding contractual liability. While we do not completely disagree with the district court, we find it necessary to reverse and remand the case.

Stauffer Chemical Company operates a carbon bisulphide plant at LeMoyne, Alabama, which uses crude sulphur as a basic raw material in its manufacturing process. This crude sulphur, in bulk form, is transported from Port Sulphur, Louisiana, to Stauffer's dock at LeMoyne in covered hopper type barges by Sioux City and New Orleans Barge Lines, Inc. pursuant to a written contract. On October 1, 1957, Stauffer entered into a contract with Brunson Construction Company whereunder Brunson agreed to discharge the sulphur from the barges and haul it by means of dump trucks from the dock to the Stauffer plant. On November 23, 1958, two barges were delivered to the Stauffer dock and on the following day Brunson discharged approximately 661 tons from one of the barges, Barge 1515, and before leaving the area that evening, Brunson's foreman checked the 1515 to be sure that it was secure. Early the next morning one of the Stauffer employees discovered the barge partially submerged which resulted in severe damage to the remaining sulphur cargo. Sioux City and Stauffer filed libels[1] against Brunson alleging negligent discharge and seeking recovery for their respective losses, damage to the barge and damage to the sulphur. Stauffer also predicated its right to recover on the terms of the contract between it and Brunson. Although the district court found that Brunson did not discharge the sulphur negligently and that Brunson was not liable under the contract, only that portion of the court's decision relating to contractual liability is the subject of this appeal.

The contract[2] between Stauffer Chemical Company and Brunson Construction Company specified that Brunson would be solely responsible for the sulphur until delivered at the Stauffer plant. This portion of the contract reads:

"IV. *Responsibility*

[Brunson] shall have the sole and exclusive care, custody, and control of all crude solid sulphur from the time the barge carrying such sulphur is moored alongside [Stauffer's] wharf or pier, and until such sulphur shall be delivered to and accepted by [Stauffer] at the sulphur slabs located at [Stauffer's] plants at LeMoyne. [Brunson] assumes full responsibility

---

1. Stauffer's libel was also filed against Sioux City, in personam, and the Barge 1515, in rem, on the basis that Sioux City, in breach of its oral undertaking with appellant, failed to furnish a seaworthy barge, in that there was a fracture in the starboard forward rake knuckle of such barge. In its answer Sioux City denied the allegation that the Barge 1515 was unseaworthy and asserted that libelant breached its contract with respondent by failing to carry full coverage standard marine cargo insurance with Sioux City named as co-assured and by virtue of said contract breach by libelant, it was not entitled to recover from respondent in this action. Subsequently, Stauffer amended its libel so as to strike Sioux City and the Barge 1515 as parties respondent to such libel.

2. Brunson obtained the contract with Stauffer for the stevedoring operations on low bid. The contract between Stauffer and Brunson was prepared by Stauffer's attorney in New York during the weeks immediately preceding the signing thereof. According to the testimony of James B. Allen, Superintendent of Operations of Stauffer Chemical Co., the original draft of the contract was modified at Stauffer's plant before the final document was approved by the parties. Initially Brunson worked as subcontractor for J. S. Walton, who originally had a similar contract with Stauffer for the unloading of the sulphur barges. As a subcontractor he furnished the trucks used to haul the sulphur from the dock to the plant.

for any and all damage thereto or loss thereof however occurring during the time that said barges are in [Brunson's] custody or possession. The measure of damage to [Stauffer] in all cases of loss or damage shall be based on the invoice price of crude sulphur at the mines, plus insurance and transportation charges."

Therefore, according to the express terms of the contract, the sulphur was under Brunson's exclusive care, custody and control when the sinking of the barge occurred during the night of November 24/25, thereby rendering Brunson liable for the damage to the cargo of sulphur. But the district court found that Stauffer by its actions and conduct had assumed the duty of checking the barges at night and therefore the court concluded that this conduct of Stauffer relieved Brunson of custody and control of the crude sulphur during the nighttime hours[3] and placed on Stauffer full responsibility for the sulphur cargo during such hours. Accordingly, the district court held that Brunson was not contractually liable for the damage to the sulphur cargo.

Stauffer contends that it neither expressly nor by its acts and conduct relieved Brunson of his contractual responsibility. Conversely, it is contended by Brunson that Stauffer by words and actions affirmatively assumed responsibility for the cargo and the barges during the hours of darkness and when the same were not being actively discharged. Accordingly, Brunson submits that the findings of the district court are not clearly erroneous and its conclusions of law are adequately supported by the facts as found.

Brunson supports, in part, his claim that he was relieved of responsibility for the barges at night by arguing that one of the services which he agreed to per-

form, as set forth in Section I(b) of the contract, was the basis of the responsibility clause of the contract and such provision was effectively modified by the parties, thereby setting up a chain reaction which resulted in the modification of the responsibility clause. Section I(b) of the contract provides that Brunson shall:

"Furnish crane and all the necessary equipment to completely discharge barge and truck sulphur from dock to storage pads. Such equipment shall consist of crane, tight buckets, dump trucks, and any other equipment necessary to completely discharge barges of sulphur within twenty-four (24) hours (per barge) after it is moored at [Stauffer's] dock, Saturday, Sunday, Holidays' and weather not excepted."

The evidence clearly demonstrates that Brunson is correct in his assertion that the above contract provision was modified and in addition the evidence shows that another service which Brunson agreed to perform, that set forth in Section I(h), was also modified by the parties. Section I(h) provides that Brunson shall:

"Furnish any and all other services or facilities, including labor, requisite for the complete job of accomodating [sic] and unloading barges carrying crude sulphur intended for delivery to [Stauffer's] plants at LeMoyne, and transporting such crude sulphur to the sulphur slabs at [Stauffer's] said plants."

The above contract provisions, clauses I(b) and I(h), placed upon Brunson the duty to furnish all necessary equipment and all other services or facilities to accommodate and completely discharge the barges and transport the sulphur to the Stauffer plant. Brunson never obtained all the necessary equipment for complete

---

3. The district court made no finding as to whether Stauffer had *expressly* relieved Brunson of care, custody and control of the barges at night. In its opinion the court stated:

"Although the evidence is in dispute as to who had custody and control of the barges at night, the court finds that if not expressly, certainly by its actions, Stauffer assumed control over the barges during the hours of darkness."

discharge of the barges, but instead Stauffer furnished several items such as payloaders, pumps and tarpaulins.[4] In addition Brunson performed the service of switching the barges only at the initial stages of the contract. The barges arrived in pairs. One barge would be anchored to piling clusters upstream from the pier and the other would be placed adjacent to the dock for discharge. When discharge was completed it was necessary to shift the barges, moving the upstream full barge to an unloading position and moving the empty barge away from the pier. At first Brunson attempted this shifting operation but when Brunson almost lost a barge during such an operation, Stauffer assumed the responsibility for shifting the barges by engaging the services of a tug.[5] Although it could be argued that this operation was not a service Brunson was obligated to perform under the contract, we find that it could be argued with equal force that the shifting operation is a service to accommodate the barges and therefore included in Brunson's duties under clause I(h). Consequently, the contract provisions, I(b) and I(h) were effectively modified by the parties when Stauffer entered into the practice of furnishing various items of equipment to Brunson and when it undertook to perform the shifting operation.

Clause I(b) was further modified by the parties. Such clause placed upon Brunson the duty to furnish equipment necessary to completely discharge a barge within 24 hours after its arrival at Stauffer's dock. The first barges were unloaded within 24 hours. Since it took approximately 16 hours to unload a barge, some unloading at night was necessitated. But after the first barges were unloaded in this manner the practice was abandoned and Stauffer relieved Brunson of his duty to unload a barge within 24 hours after its arrival and allowed Brunson to discharge the barges only in daylight hours. This change in the method of operation was caused by several factors. The matter of demurrage was eliminated as a reason for unloading at night.[6] Stauffer was to furnish a safe berth and wharf or pier for the barges.[6a] Actually the facilities at the river were not adequate for unloading at night. The pier was narrow and necessitated the leaving of Brunson's crane in one position during the unloading operation, and as a result it was necessary to shift a barge before it could be completely unloaded. Additionally, unloading at night could not be performed adequately due to the lack of illumination of the area. This lack of lighting at the dock area created a hazard to the safety of both workmen and equipment. Consequently, the contract was modified

4. During the Walton contract and the Brunson contract small payloaders, motorized scoops, were loaned to Brunson by Stauffer in order to get the surphur out of the wings and against the bulkheads of the box in barge, after the square of the hatch had been cleaned of cargo. Brunson also borrowed pumping equipment from Stauffer when it found a barge to be leaking. At all times Stauffer maintained and kept this equipment in operating condition. Stauffer also furnished Brunson with tarpaulins to put over the trucks to prevent wind loss of sulphur. Although several of Stauffer's employees were asked if Stauffer gave Brunson any brooms, all replied they did not know except Mitchell, Plant Manager, who testified that he would assume Stauffer fur-

nished the brooms to sweep the barges down.

5. Although Stauffer's personnel testified that Brunson shifted the barges or that they could not recall who actually performed the shifting operation, the record unequivocally shows that Stauffer employed M&L Towing Company and Oswell Towing Company to shift the barges and further that Stauffer paid for such services at no expense to Brunson.

6. The possibility that Stauffer would incur demurrage is discussed more fully later in this opinion.

6a. "The COMPANY shall:
   a) Furnish safe berth and wharf or pier for steal [sic] or wood barges each containing crude sulphur at LeMoyne."

so as to only require Brunson to unload the barges during the day.

Brunson contends that the contract provision requiring him to unload a barge in 24 hours is related to the provision placing full responsibility on him for the safety of the cargo. He argues that the primary reason for making him sole custodian and solely responsible for the cargo on a 24 hour basis was the fact that he was required to discharge on a 24 hour basis and therefore would be in constant company of the barges. Therefore Brunson submits that the modification of the contract which extinguished his duty to unload at night resulted in a modification of his contractual responsibility to the extent of eliminating his nighttime responsibility.

We reject this contention. Brunson's reasoning that the requirement to furnish equipment adequate to discharge a barge in 24 hours would require that he be always present at the dock site when the barges were moored there is faulty. According to Brunson's own testimony, discharge of one barge took only 16 hours. Therefore, complying with the exact terms of the contract would not require Brunson to be in constant attendance of the barges nor would the terms of the contract require Brunson to continuously discharge during an entire 24 hour period.

The contract itself indicates absolutely no connection between Brunson's duty to discharge and Brunson's position as sole custodian. In fact these provisions are listed under different headings, the duty to discharge being under the section entitled "I. Services" and Brunson's designation as sole custodian being under section "IV. Responsibility."

Most importantly, the purpose for inserting the requirement to furnish adequate equipment to unload a barge in 24 hours is unrelated to the responsibility clause. This requirement was inserted in the contract to provide against the possibility of incurring demurrage on the barges. Stauffer's contract with Sioux City provided that if its tug stood by, Stauffer would have one free day for each barge and thereafter would be charged demurrage.[7] Therefore we find no connection between the two requirements and consequently modification of the 24 hour discharge requirement did not affect Brunson's responsibility for the cargo.[7a]

Brunson also contends he was relieved of his contractual responsibility for the barges and the sulphur cargo during the nighttime hours because Stauffer expressly and by its actions assumed complete responsibility during such hours. This contention is based on Brunson's claim that Stauffer both by words and actions adopted the practice of having his men go to the dock during the night to look at the barges. Therefore, in order for us to find that Brunson was totally relieved of this contractual responsibility during the hours of darkness we must first find that Stauffer did in fact assume the duty of watching the barges at night and then we must find that such action amounts to an assumption by Stauffer of complete custody and control of the barges which negated Brunson's responsibility for the cargo of sulphur during such hours.

Brunson testified that Mitchell, Stauffer's Plant Manager, told him right after they started the contract that some of Stauffer's men would look after the barges at night.[8] On the other hand,

7. As a matter of fact, it subsequently developed that Sioux City's tug did not follow the practice of standing by.

7a. We also note that the contract between Stauffer and Brunson contained a no waiver provision which reads:
"Waiver by [Stauffer] of any particular default by [Brunson] shall extend only to the particular default waived and shall not constitute a waiver of any

previous or subsequent defaults nor in any way limit or effect the rights or remedies of [Stauffer] with respect thereto."

8. This testimony reads as follows:
"Q. Now do you recall having any conversations with Mr. Gordon Mitchell as to whether or not Stauffer Chemical Company would look after the barges during

Mitchell emphatically denied that he ever made such a statement.[9] The district court refrained from resolving this dispute over what Mitchell did or did not say to Brunson regarding the barges at night.[10] Accordingly, we do the same.

■■ There is a great deal of testimony concerning whether Stauffer assumed the duty of looking after the barges at night by sending its men to the dock area at night to check on the barges. It is undisputed that normally Brunson's men never remained at night to look after the barges and it is also undisputed that some of Stauffer's personnel would on occasion go to the dock site at night. But the purpose of these visits is in great dispute. Brunson tried to prove that Stauffer assigned men to patrol the dock area or employed a night watchman, but to no avail. Stauffer personnel solidly testified that they had never been assigned to check the barge or ordered to the dock site to watch the barges, nor were they aware of anyone at the Stauffer plant being so assigned. Stauffer employees explained their visits to the dock as being "casual", or for purely personal reasons. On one such occasion a leak was discovered in a barge moored at the dock and on another oc-

casion a fire was found near or on the barge.[11] Brunson also testified that from time to time, on questioning these men during the day about their visits they had replied that everything was fine at the docks during the night thus implying that they had observed the barges closely enough to render a judgment on conditions at the dock which would tend to render their night visits somewhat less "casual" than they unanimously claimed. Also whether the visit which led to the discovery of the sunken Barge 1515 was "casual" is open to question. The 1515 was first seen in its submerged condition by Jesse Huddle, maintenance foreman for Stauffer, who testified that he had gotten to work about 5:30 or 6:00 A.M., one and a half to two hours before his working hours began that day,[12] and he decided to go down to the pier whereupon he found the sunken barge. Although Allen and Mitchell supported Huddle's statement that he found the barge around 6:00 A.M., Brunson testified that Mitchell called him at 3 or 4 A.M. to inform him that the barge had sunk. Faced with this array of testimony the district court found that Stauffer personnel went to the dock area to check the barges at night. Upon a

---

the period that you were not actually discharging?

"A. [Brunson] Well, the only conversation I had with Mr. Mitchell about this was that he always cautioned us always to be sure and tie the barges up good, check for leaks, check for fires, and he said 'some of our men would check at night.'"

\* \* \* \* \*

Robinson, Foreman for Brunson, testified in a similar manner:

"Q. What did [Mitchell] say about looking out after them at night?

"A. He said the men that was on duty would drop by to see them, to take a look at them."

9. Mitchell's testimony reads:

"Q. I ask you whether or not you ever told Mr. Brunson or Mr. Robinson for them not to worry, that you would have your men look after those barges at night?

"A. [Mitchell] I certainly did not say that.

"Q. Did you hear anybody on behalf of Stauffer say that?

"A. [Mitchell] No, sir."

10. See footnote 3.

11. The testimony of James B. Allen, Superintendent of Operations of Stauffer Chemical Co. and Gordon A. Mitchell, Stauffer's Plant Manager, concerning these occasions is somewhat vague. Even though they do not recall these circumstances with any degree of clarity they do not deny that the events occurred.

12. Allen commented about this early arrival:

"Yes, our foremen have a habit of coming in early and simply dropping on [sic] on whatever happens to be going on. I know Mr. Huddle does that now. We found him at the plant last week at 4:00 A.M. That is, I found him then, and I said, 'What is the matter, couldn't you sleep?' and he said, 'No, I just woke up.'"

careful review of the record we are unable to conclude that the findings of fact by the trial court are clearly erroneous, and upon a review of the record as a whole, we are not left with the clear impression that an error has been made. We fail to disturb these findings even though it may also be true that the evidence is capable of supporting contrary findings of fact. There was a clear factual dispute. Accordingly, we affirm the findings of fact made by the district court.

Considering all the factors and circumstances which have been discussed in this opinion, the record amply supports the conclusion that the parties by their words, acts and conduct modified, altered and amended their contract for the mutual benefit of both. Bankoff v. Wycoff (10 Cir. 1956) 233 F.2d 476; Pekar v. Local U. No. 181, Int. U. of United Brewery, etc. Wkrs. (6 Cir. 1962) 311 F.2d 628; Colorado Mining and Elevator Co. v. Glenn (W.D.Ky.1954) 118 F.Supp. 943; Hill v. Davis (1961) 272 Ala. 166, 130 So.2d 39; Gadsden Buick Co. v. Cranford (1961) 273 Ala. 37, 134 So.2d 421. However, there remains the question of whether these modifications of the contract altered the responsibility clause. The district court having found that Stauffer assumed the duty of night watch, concluded that this conduct relieved Brunson of his contractual duty to keep a watch over the barges and placed the custody and control of the barges with Stauffer, which relieved Brunson of all responsibility for the barges except for the daylight hours when Brunson was actually unloading the barges. We cannot accept the district court's conclusion that Stauffer's actions and conduct relieved Brunson of his contractual duty to watch the barges. The contract between the parties makes no mention of such a duty. The contract places upon Brunson sole responsibility for the barges and their cargo but does not require Brunson to follow any particular mode of conduct. There is a distinction between a *duty to check the barges* and the *responsibility* for their loss. Moreover, the actual actions and conduct of the parties in carrying out the contract do not indicate that Brunson at any time had a duty literally to check the barges at night but that Stauffer voluntarily created and assumed such a duty. Therefore we must decide whether Stauffer's practice of checking the barges at night, while not relieving Brunson of any *duty to check* the barges, relieved Brunson of any or all *responsibility* for the barges and sulphur during the night hours and thereby constituted a modification of the responsibility clause.

██ Stauffer had sufficient interest to watch and inspect. The mere fact that it did so can not be said to constitute an absolute waiver of the provision placing complete responsibility for loss or damage on Brunson. Brunson's conduct on two separate occasions leads us to the conclusion that the actions of Stauffer did not remove all responsibility from Brunson. Brunson testified that Mitchell called him one night at home and told him one of the barges was leaking. Stauffer had put a pump on board and had begun pumping. Brunson immediately sent one of his men to take charge and he spent the rest of the night on the pump. Again, on the night the Barge 1515 sank, Brunson was called by Mitchell and Brunson offered to go to the dock and do whatever was necessary. Unfortunately, there was nothing Brunson could do because the barge was already sunk and was not moving any further down into the river. In addition, Brunson was called one night and informed that a smouldering fire outside the dock area had been put out by Stauffer's men. We also take note of the fact that Brunson gave a negative reply when asked whether Mitchell had ever said that Stauffer would relieve Brunson of responsibility.[13]

13. The following is from the testimony of Brunson:

"Now, Mr. Brunson, did Mr. Mitchell ever say to you, following the signing

 We recognize that alteration, modification or waiver of contract provisions may be implied from the acts and circumstances surrounding the performance of such contract. Bankoff, et al. v. Wycoff, et al., 233 F.2d 476 (10 Cir. 1956); Rand v. Helvering, 116 F.2d 929 (8 Cir. 1941). However, we find that the conduct of the parties in the instant case, Stauffer's notifying Brunson during the night of dangerous or potentially dangerous situations which had developed at the dock site and Brunson's taking control of the situation or asking if he was needed at the dock, indicates that the parties did not modify the responsibility clause to the extent of placing *full* responsibility on Stauffer. Nevertheless, we find that Stauffer's practice of watching the barges during the night did modify the responsibility clause to the extent that Stauffer became responsible for any damage to the cargo occasioned by its own neglect in not performing its assumed duty with reasonable care. The fact that Stauffer had voluntarily assumed the duty of night watch was well known to Brunson. In addition, Brunson, by periodically checking with Stauffer employees as to conditions at the dock during the night, relied on Stauffer to properly perform its self-assigned function.

When one voluntarily assumes a duty he is bound to perform it with care and if done negligently, he is liable for damage resulting from such negligence. Blaber, et al. v. U. S., 322 F.2d 629 (2 Cir. 1964); Kurzweg v. Hotel St. Regis Corp., 309 F.2d 746 (2 Cir. 1962); Hastorf Contracting Co. v. Ocean Transp. Corporation, et al., 4 F.2d 583 (S.D. N.Y.1923); Meyerson v. New Idea Hosiery Co., 217 Ala. 153, 115 So. 94, 55 A.L.R. 1231 (1927); H. H. Parker & Bro. v. Hodgson, 172 Ala. 632, 55 So. 818 (1911). The record does not reveal that any of Stauffer's men watched the barges on the night Barge 1515 sank. According to the record the barge was found, either at 3:00 or 6:00 A.M., already in its sunken condition and beyond help. We cannot speculate as to the results if Stauffer had properly performed its assumed duties with respect to watching the barges and had notified Brunson and called on him for help. Therefore, the case must be remanded to the district court for a determination of this issue. If it is found that the damage to the cargo resulted from Stauffer's negligence in not properly checking the barges during the night in question, then Stauffer must pay the penalty for its own neglect. But if it is found that the damage was not caused by any negligence on the part of Stauffer, then Brunson must bear the loss.

Reversed and remanded.

---

of your contract, 'Now, Mr. Brunson, we know your contract obligates you to take care, custody and control of this barge and cargo, and you will hold us harmless, but we are going to take hold of that responsibility and relieve you of it.' Did he ever say that to you, or words to that effect? "A. No, sir, he didn't."