NOONAN CONSTRUCTION COMPANY, Inc., Plaintiff-Appellee,

v.

FEDERAL BARGE LINES, INC., et al., Defendants-Appellants.

PENSACOLA DEVELOPMENT COMPANY, Inc., Plaintiff-Appellee,

v.

FEDERAL BARGE LINES, INC., et al.,

Defendants-Appellants.

No. 71–1626
Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

Jan. 17, 1972.

---

* ▮ Rule 18, 5 Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York, et al., 5 Cir., 1970, 431 F.2d 409.

Charles Kohlmeyer, Jr., William E. O'Neil, New Orleans, La., Emmett R. Cox, Mobile, Ala., for defendants-appellants; Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher, New Orleans, La., of counsel.

James J. Duffy, Jr., John N. Leach, Jr., Mobile, Ala., for appellee Noonan Const. Co., Inc.; Inge, Twitty, Duffy & Prince, Mobile, Ala., of counsel.

Marion R. Vickers, Jr., Mobile, Ala., for cross-defendant-appellee, Ideal Basic Industries, Inc.; Vickers, Riis, Murray & Curran, Mobile, Ala., of counsel.

Alex F. Lankford, III, A. Clay Rankin, III, Mobile, Ala., for appellee, Pensacola Development Co., Inc.; Hand, Arendall, Bedsole, Greaves & Johnston, Mobile, Ala., of counsel.

Before BELL, AINSWORTH and GODBOLD, Circuit Judges.

AINSWORTH, Circuit Judge:

These consolidated claims in admiralty arise out of the capsizing of a steel cement barge PDC–1, partially laden, in the Mobile River on August 16, 1966. The casualty occurred in a public fleeting area operated by Federal Barge Lines, Inc. The District Court entered judgment in favor of the barge and cargo interests and against Federal.[1] The Court also denied relief to Federal on its counterclaim. Federal has appealed. We affirm, finding no error in the findings and conclusions of the Trial Judge.

Federal maintained its fleeting operation on the East Bank of the Mobile River. Federal's facilities consisted of three barges, permanently attached to the river bank, which formed a bulkhead or docking area for other barges. The facility was open to the public for storage or fleeting of barges for the sum of $6 per day. An additional charge was made for services rendered by Federal other than storage or fleeting.

Federal employed several watchmen in its operation. The watchmen were responsible for checking incoming barges into the fleet and making appropriate entries in the company's log book for billing purposes. Federal published rules for the conduct of its watchmen. These rules provided that the watchmen should place lanterns on the barges before sundown and take them in the next

---

1. Barge PDC–1 was owned by Pensacola Development Company, Inc. It had been orally chartered to Ideal Cement Company. Pensacola was insured by Continental Insurance Company. The cargo aboard the barge belonged to Noonan Construction Company, Inc., which was insured by Aetna Casualty & Surety Company.

morning before they left. Watchmen were required to punch time clocks hourly beginning at 5 p.m. and ending at 8 a.m. on the next day. The company installed three time clocks on the three permanently moored barges for this purpose. The watchmen were to "be on job at all time to see that barges or [sic] secured properly. Each barge in fleet to be checked every other hour to make sure barges or [sic] secure." Watchmen were not to accept barges into the fleet without proper tie-off lines or cables. Federal furnished lines for their barges only. While working on the barges, watchmen were required to wear life jackets. Other regulations were promulgated relative to the use of a shed constructed by Federal which was used for an office. Watchmen stayed in the office when not making their rounds. However, the company mandated that "DUTIES OF A WATCHMAN OR [sic] TO WATCH THE BARGES IN FLEET. NOT THE OFFICE." Moreover, watchmen were required to meet every boat on arrival and to stay with the boat, not in the office while the boat is making or breaking tow.

On the evening in question, Watchman Davis met the barge PDC–1 when she was towed by Ideal to the mooring facility. Davis directed where she was to be moored, assisted in tying her up, and placed a Federal lantern on her. PDC–1 was moored on the northwest corner of the fleet, the third barge out from the permanent barges. The raised deckhouse of the PDC–1 was clearly visible from anywhere in the fleet. In accordance with Federal's own rules, Watchman Davis had been stationed to look out after the barges. He was to make a round of the permanent fleeting barges every hour on the hour, to observe the barges moored in the fleet, and to punch his clock at the appropriate stations. Every other hour, he was to go out onto the barges to check mooring lines. Davis testified that on the night of the casualty, he made his rounds according to schedule. He testified that he sighted or "glanced" at the PDC–1 every hour between 1900 and 0245 hours and that every other hour he looked at the mooring lines of the PDC–1. He first noticed that the barge was missing at 2:45 a. m. on August 16. This gave him no concern because he assumed that a tug had picked up the barge without letting him know. Only at daylight did he realize that she was overturned, bottom up, in the river. But the District Court found the witness's testimony incredible:

"  .   .   .   it is difficult to understand how, if the watchman made any meaningful inspection about 0300 hours, he did not wonder what had happened to the lantern he had placed on the barge, and question the reason for the barge's broken mooring lines which were found at daylight that morning, on the next barge, the HTC–213. Additionally, 2 entries in his log have been scratched through and cannot be read, and another entry, in different ink, added, without plausible explanation, raising a substantial question as to whether the barge actually capsized or was noted to be missing until about 0600 hours, rather than 0245 hours of August 16, 1966."

Federal contended that the barge must have sunk suddenly. The District Court rejected the contention on the basis of the testimony of naval architect Robert Macey to the effect that the sinking and capsizing could not have occurred for many hours after the deck at the stern was starting to go awash. The District Court concluded that the barge was in obvious danger for at least four hours before capsizing and that the watchman should have seen that danger and should and could have taken action in time to prevent the loss. The finding is amply supported by the evidence.

Nevertheless, Federal asserts that its watchmen could have done nothing to prevent the loss; that a barge owner may not hold a fleeter responsible

for an inevitable sinking on the theory that the fleeter negligently failed to realize that the barge was sinking and attempt to prevent her loss. But the facts belie the argument. Cf. Hart v. Blakemore, 5 Cir., 1969, 410 F.2d 218, 222. The sinking here was not "inevitable." The record is clear that Watchman Davis had sufficient pumps of varying sizes available to him which could have been used to keep the barge afloat. Davis also had tools to remove the barge's manhole covers. The evidence indicated that Davis could have utilized all the available equipment himself. He had done so on other occasions. We are left with the firm conviction that this loss could have been avoided had the watchman realized what should have been obvious—that the barge was sinking.

■ Even so, Federal urges that it had no duty to watch the barge PDC–1 and that it "never held itself out to do more than to afford a position at its landing where a third party could temporarily moor a barge while awaiting further orders." However, the evidence in this case is to the contrary. Federal's Captain Caplener testified that if he had seen a barge in that condition, he certainly should have reported it and done everything he could to save it. Caplener further testified that the $6 per day fee clearly included looking out after the barge "if we had a watchman there." Federal's Steadman testified that watchmen were to go on the barges every other hour to observe the mooring lines. On the off-hour, watchmen were at least to look over the whole fleet. They were required to punch time clocks to prove that they had done so.

■ We have previously recognized that a "fleeter" is a kind of a limited bailee and that his liabilities depend exclusively on the obligations which he has himself undertaken in his contract with the owners of vessels entrusted to his care. For example, in John I. Hay Co. v. The Allen B. Wood, E.D.La., 1954, 121 F.Supp. 704, aff'd sub nom., Martin Oil Service v. John I. Hay Company, 5 Cir., 1955, 219 F.2d 237, the District Court found that the fleeter "undertook to provide watchman service for the Hay barges," 121 F.Supp. 704, 707, and that whether or not he was considered a bailee he "was negligent in failing to take available remedial measures to safeguard the Hay barges when its employees became aware that those vessels were not adequately secured." Id. at 708. On appeal we affirmed on the ground that there was sufficient evidence that the fleeter was at fault together with a tug whose negligence in securing the barge, in part contributed to the loss.

Stauffer Chemical Company v. Brunson, 5 Cir., 1967, 380 F.2d 174, aff'd after remand, 5 Cir., 1969, 409 F.2d 1327, involved the loss of a sulphur barge at dockside. The case is quite similar to this case. Brunson had agreed in a written contract to be solely responsible for the sulphur aboard the barge until delivered at the Stauffer plant. Judge Gewin for the Court noted that "according to the express terms of the contract, the sulphur was under Brunson's exclusive care, custody and control when the sinking of the barge occurred during the night . . . ." 380 F.2d at 177. However, the record showed that Stauffer had assumed the duty of looking after the barges at night by sending men periodically to check on them. Thus, the Court said that "Stauffer's practice of watching the barges during the night did modify the responsibility clause to the extent that Stauffer became responsible for any damage to the cargo occasioned by its own neglect in not performing its assumed duty with reasonable care." 380 F.2d at 182. As a general principle "[w]hen one voluntarily assumes a duty he is bound to perform it with care and if done negligently, he is liable for damages resulting from such negligence." Id. at 182. We remanded the case on the issue of causation. On subsequent appeal of the case

we affirmed the District Court's conclusion that "had the barge been properly watched by appellant during the night, the gradual settling by the head would have been apparent and sinking could have been prevented by the use of pumps." 409 F.2d 1327, 1328.

Similarly, in Dow Chemical Company v. Barge UM–23B, 5 Cir., 1970, 424 F.2d 307, we found that "[t]he owners and operators surrendered the custody and control of their barges to Cargo Carriers relying on its expertise as a wharfinger," particularly in regard to the mooring of the barges. Thus, Cargo Carriers was the party best situated to prevent accidents occasioned by faulty moorings. When a loss occurred because of insufficient moorings, we held Cargo Carriers accountable. See also Federal Barge Lines, Inc. v. Star Towing Company, Inc., E.D.La., 1967, 263 F.Supp. 981, where Federal obtained a judgment against Star Towing because Federal's barge was improperly cared for by Star's watchman.

We hold that when a fleeter voluntarily assumes a duty to provide watchmen for the care and safekeeping of barges which are entrusted with him, he is bound to perform that obligation with due care. Part of the fleeter's obligation entails recognizing when such barges become in serious danger of capsizing or sinking and taking available measures for the safety of the barge. The District Court found that the "lack of attention by Federal's watchman to the dangerous condition of the barge was the sole proximate cause of its capsizing and loss, regardless of when or how the hole occurred." This finding is not clearly erroneous and we therefore affirm. See Fed.R.Civ.P., Rule 52(a); Chaney v. City of Galveston, 5 Cir., 1968, 368 F.2d 774.

We have carefully reviewed all of Federal's claims of error and find no merit in any of them.

Affirmed.