**INDIANA HARBOR BELT RAILROAD COMPANY, Plaintiff–Appellee, Cross–Appellant,**

v.

**AMERICAN CYANAMID COMPANY, Defendant–Appellant, Cross–Appellee.**

**Nos. 89–3703, 89–3757.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 7, 1990.

Decided Oct. 18, 1990.

Anna M. Kelly, Roger A. Serpe, Chicago, Ill., for plaintiff-appellee, cross-appellant.

Thomas D. Allen, Ruth E. VanDemark, Iren J. Ustel, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for defendant-appellant, cross-appellee, American Cyanamid Company.

Robert L. Landess, Daniel P. Hogan, Ross & Hardies, Chicago, Ill., for defendant, cross-appellee, Missouri Pacific Railroad Company.

John M. Christian, Jan Feldman, Stanley V. Figura, Phelan, Pope & John, Chicago, Ill., for amicus curiae Chemical Industries Council of Illinois.

David G. Norrell, Eric P. Heichel, Kirkland & Ellis, Washington, D.C., for amici curiae Chemical Mfrs. Ass'n, Nat. Agricultural Chemicals Ass'n, Fertilizer Institute, Chlorine Institute, Compressed Gas Ass'n, Nat. Propane Gas Ass'n, Nat. Indus. Transp. League, American Petroleum Institute.

Martin W. Bercovici, Kris A. Monteith, Keller & Heckman, Washington, D.C., for amici curiae American Fiber Mfrs. Ass'n, Inc., Rubber Mfrs. Ass'n, Inc., Soc. of Plastics Industry, Inc.

Before POSNER, MANION and KANNE, Circuit Judges.

POSNER, Circuit Judge.

American Cyanamid Company, the defendant in this diversity tort suit governed by Illinois law, is a major manufacturer of chemicals, including acrylonitrile, a chemical used in large quantities in making acrylic fibers, plastics, dyes, pharmaceutical chemicals, and other intermediate and final goods. On January 2, 1979, at its manufacturing plant in Louisiana, Cyanamid loaded 20,000 gallons of liquid acrylonitrile into a railroad tank car that it had leased from the North American Car Corporation. The next day, a train of the Missouri Pacific Railroad picked up the car at Cyanamid's siding. The car's ultimate destination was a Cyanamid plant in New Jersey served by Conrail rather than by Missouri Pacific. The Missouri Pacific train carried the car north to the Blue Island railroad yard of Indiana Harbor Belt Railroad, the plaintiff in this case, a small switching line that has a contract with Conrail to switch cars from other lines to Conrail, in this case for travel east. The Blue Island yard is in the Village of Riverdale, which is just south of Chicago and part of the Chicago metropolitan area.

The car arrived in the Blue Island yard on the morning of January 9, 1979. Several hours after it arrived, employees of the switching line noticed fluid gushing from the bottom outlet of the car. The lid on the outlet was broken. After two hours, the line's supervisor of equipment was able to stop the leak by closing a shut-off valve controlled from the top of the car. No one was sure at the time just how much of the contents of the car had leaked, but it was feared that all 20,000 gallons had, and since acrylonitrile is flammable at a temperature of 30° Fahrenheit or above, highly toxic, and possibly carcinogenic (*Acrylonitrile,* 9 International Toxicity Update, no. 3, May–June 1989, at 2, 4), the local authorities ordered the homes near the yard evacuated. The evacuation lasted only a few hours, until the car was moved to a remote part of the yard and it was discovered that only about a quarter of the acrylonitrile had leaked. Concerned nevertheless that there had been some contamination of soil and water, the Illinois Department of Environmental Protection ordered the switching line to take decontamination measures that cost the line $981,022.75, which it sought to recover by this suit.

One count of the two-count complaint charges Cyanamid with having maintained the leased tank car negligently. The other count asserts that the transportation of acrylonitrile in bulk through the Chicago metropolitan area is an abnormally dangerous activity, for the consequences of which the shipper (Cyanamid) is strictly liable to the switching line, which bore the financial brunt of those consequences because of the decontamination measures that it was forced to take. After the district judge denied Cyanamid's motion to dismiss the strict liability count, 517 F.Supp. 314 (N.D. Ill.1981), the switching line moved for summary judgment on that count—and won. 662 F.Supp. 635 (N.D.Ill.1987). The judge directed the entry of judgment for $981,-022.75 under Fed.R.Civ.P. 54(b) to permit Cyanamid to take an immediate appeal even though the negligence count remained pending. We threw out the appeal on the ground that the negligence and strict liability counts were not separate claims but merely separate theories involving the same facts, making Rule 54(b) inapplicable. 860 F.2d 1441 (7th Cir.1988). The district

judge then, over the switching line's objection, dismissed the negligence claim with prejudice, thus terminating proceedings in the district court and clearing the way for Cyanamid to file an appeal of which we would have jurisdiction. There is no doubt about our appellate jurisdiction this time. Whether or not the judge was correct to dismiss the negligence claim merely to terminate the lawsuit so that Cyanamid could appeal (the only ground he gave for the dismissal), he did it, and by doing so produced an incontestably final judgment. The switching line has cross-appealed, challenging the dismissal of the negligence count.

The question whether the shipper of a hazardous chemical by rail should be strictly liable for the consequences of a spill or other accident to the shipment en route is a novel one in Illinois, despite the switching line's contention that the question has been answered in its favor by two decisions of the Illinois Appellate Court that the district judge cited in granting summary judgment. In both *Fallon v. Indiana Trail School*, 148 Ill.App.3d 931, 934, 102 Ill.Dec. 479, 481, 500 N.E.2d 101, 103 (1986), and *Continental Building Corp. v. Union Oil Co.*, 152 Ill.App.3d 513, 516, 105 Ill.Dec. 502, 504–05, 504 N.E.2d 787, 789–90 (1987), the Illinois Appellate Court cited the district court's first opinion in this case with approval and described it as having held that the transportation of acrylonitrile in the Chicago metropolitan area is an abnormally dangerous activity, for which the shipper is strictly liable. These discussions are dicta. The cases did not involve acrylonitrile—or for that matter transportation—and in both cases the court held that the defendant was not strictly liable. The discussions were careless dicta, too, because the district court had not in its first opinion, the one they cited, held that acrylonitrile was in fact abnormally dangerous. It merely had declined to grant a motion to dismiss the strict liability count for failure to state a claim. We do not wish to sound too censorious; this court has twice made the same mistake in interpreting the district court's first opinion. *Martin v. Harrington & Richardson, Inc.*,

743 F.2d 1200, 1203 (7th Cir.1984); *City of Bloomington v. Westinghouse Elec. Corp.*, 891 F.2d 611, 615 (7th Cir.1989). But mistake it is. The dicta in *Fallon* and *Continental* cannot be considered reliable predictors of how the Supreme Court of Illinois would rule if confronted with the issue in this case. We are not required to follow even the *holdings* of intermediate state appellate courts if persuaded that they are not reliable predictors of the view the state's highest court would take. *Williams v. Lane*, 826 F.2d 654, 662–63 (7th Cir.1987); *Williams, McCarthy, Kinley, Rudy & Picha v. Northwestern National Ins. Group*, 750 F.2d 619, 624–25 (7th Cir.1984); *Klippel v. U–Haul Co.*, 759 F.2d 1176, 1181 (4th Cir.1985). No court is required to follow another court's dicta. Cf. *Wood v. Armco, Inc.*, 814 F.2d 211, 213–14 (5th Cir.1987). Here they are not even considered or well-reasoned dicta, founded as they are on the misreading of an opinion.

The parties agree that the question whether placing acrylonitrile in a rail shipment that will pass through a metropolitan area subjects the shipper to strict liability is, as recommended in Restatement (Second) of Torts § 520, comment *l* (1977), a question of law, so that we owe no particular deference to the conclusion of the district court. They also agree (and for this proposition, at least, there is substantial support in the *Fallon* and *Continental* opinions) that the Supreme Court of Illinois would treat as authoritative the provisions of the Restatement governing abnormally dangerous activities. The key provision is section 520, which sets forth six factors to be considered in deciding whether an activity is abnormally dangerous and the actor therefore strictly liable.

The roots of section 520 are in nineteenth-century cases. The most famous one is *Rylands v. Fletcher*, 1 Ex. 265, aff'd, L.R. 3 H.L. 300 (1868), but a more illuminating one in the present context is *Guille v. Swan*, 19 Johns. (N.Y.) 381 (1822). A man took off in a hot-air balloon and landed, without intending to, in a vegetable garden in New York City. A crowd that

had been anxiously watching his involuntary descent trampled the vegetables in their endeavor to rescue him when he landed. The owner of the garden sued the balloonist for the resulting damage, and won. Yet the balloonist had not been careless. In the then state of ballooning it was impossible to make a pinpoint landing.

*Guille* is a paradigmatic case for strict liability. (a) The risk (probability) of harm was great, and (b) the harm that would ensue if the risk materialized could be, although luckily was not, great (the balloonist could have crashed into the crowd rather than into the vegetables). The confluence of these two factors established the urgency of seeking to prevent such accidents. (c) Yet such accidents could not be prevented by the exercise of due care; the technology of care in ballooning was insufficiently developed. (d) The activity was not a matter of common usage, so there was no presumption that it was a highly valuable activity despite its unavoidable riskiness. (e) The activity was inappropriate to the place in which it took place—densely populated New York City. The risk of serious harm to others (other than the balloonist himself, that is) could have been reduced by shifting the activity to the sparsely inhabited areas that surrounded the city in those days. (f) Reinforcing (d), the value to the community of the activity of recreational ballooning did not appear to be great enough to offset its unavoidable risks.

These are, of course, the six factors in section 520. They are related to each other in that each is a different facet of a common quest for a proper legal regime to govern accidents that negligence liability cannot adequately control. The interrelations might be more perspicuous if the six factors were reordered. One might for example start with (c), inability to eliminate the risk of accident by the exercise of due care. *Erbrich Products Co. v. Wills*, 509 N.E.2d 850, 857 n. 3 (Ind.App.1987). The baseline common law regime of tort liability is negligence. When it is a workable regime, because the hazards of an activity can be avoided by being careful (which is to say, nonnegligent), there is no need to

switch to strict liability. Sometimes, however, a particular type of accident cannot be prevented by taking care but can be avoided, or its consequences minimized, by shifting the activity in which the accident occurs to another locale, where the risk or harm of an accident will be less ((e)), or by reducing the scale of the activity in order to minimize the number of accidents caused by it ((f)). *Bethlehem Steel Corp. v. EPA*, 782 F.2d 645, 652 (7th Cir.1986); Shavell, *Strict Liability versus Negligence*, 9 J. Legal Stud. 1 (1980). By making the actor strictly liable—by denying him in other words an excuse based on his inability to avoid accidents by being more careful—we give him an incentive, missing in a negligence regime, to experiment with methods of preventing accidents that involve not greater exertions of care, assumed to be futile, but instead relocating, changing, or reducing (perhaps to the vanishing point) the activity giving rise to the accident. *Anderson v. Marathon Petroleum Co.*, 801 F.2d 936, 939 (7th Cir.1986). The greater the risk of an accident ((a)) and the costs of an accident if one occurs ((b)), the more we want the actor to consider the possibility of making accident-reducing activity changes; the stronger, therefore, is the case for strict liability. Finally, if an activity is extremely common ((d)), like driving an automobile, it is unlikely either that its hazards are perceived as great or that there is no technology of care available to minimize them; so the case for strict liability is weakened.

The largest class of cases in which strict liability has been imposed under the standard codified in the Second Restatement of Torts involves the use of dynamite and other explosives for demolition in residential or urban areas. Restatement, *supra*, § 519, comment d; *City of Joliet v. Harwood*, 86 Ill. 110 (1877). Explosives are dangerous even when handled carefully, and we therefore want blasters to choose the location of the activity with care and also to explore the feasibility of using safer substitutes (such as a wrecking ball), as well as to be careful in the blasting itself. Blasting is not a commonplace ac-

tivity like driving a car, or so superior to substitute methods of demolition that the imposition of liability is unlikely to have any effect except to raise the activity's costs.

Against this background we turn to the particulars of acrylonitrile. Acrylonitrile is one of a large number of chemicals that are hazardous in the sense of being flammable, toxic, or both; acrylonitrile is both, as are many others. A table in the record, drawn from Glickman & Harvey, Statistical Trends in Railroad Hazardous Material Safety, 1978 to 1984, at pp. 63–65 (Draft Final Report to the Environmental & Hazardous Material Studies Division of the Association of American Railroads, April 1986) (tab. 4.1), contains a list of the 125 hazardous materials that are shipped in highest volume on the nation's railroads. Acrylonitrile is the fifty-third most hazardous on the list. Number 1 is phosphorus (white or yellow), and among the other materials that rank higher than acrylonitrile on the hazard scale are anhydrous ammonia, liquified petroleum gas, vinyl chloride, gasoline, crude petroleum, motor fuel antiknock compound, methyl and ethyl chloride, sulphuric acid, sodium metal, and chloroform. The plaintiff's lawyer acknowledged at argument that the logic of the district court's opinion dictated strict liability for all 52 materials that rank higher than acrylonitrile on the list, and quite possibly for the 72 that rank lower as well, since all are hazardous if spilled in quantity while being shipped by rail. Every shipper of any of these materials would therefore be strictly liable for the consequences of a spill or other accident that occurred while the material was being shipped through a metropolitan area. The plaintiff's lawyer further acknowledged the irrelevance, on her view of the case, of the fact that Cyanamid had leased and filled the car that spilled the acrylonitrile; all she thought important is that Cyanamid introduced the product into the stream of commerce that happened to pass through the Chicago metropolitan area. Her concession may have been incautious. One might want to distinguish between the shipper who merely places his goods on his loading dock to be picked up by the carrier and the shipper who, as in this case, participates actively in the transportation. But the concession is illustrative of the potential scope of the district court's decision.

No cases recognize so sweeping a liability. Several reject it, though none has facts much like those of the present case. *Hawkins v. Evans Cooperage Co.*, 766 F.2d 904, 907 (5th Cir.1985); *New Meadows Holding Co. v. Washington Power Co.*, 102 Wash.2d 495, 687 P.2d 212 (1984); *Ozark Industries, Inc. v. Stubbs Transports, Inc.*, 351 F.Supp. 351, 357 (W.D.Ark. 1972). With *National Steel Service Center v. Gibbons*, 693 F.2d 817 (8th Cir.1982), which held a railroad strictly liable for transporting propane gas—but under Iowa law, which uses a different standard from that of the Restatement—we may pair *Seaboard Coast Line R.R. v. Mobil Chemical Co.*, 172 Ga.App. 543, 323 S.E.2d 849 (1984), which refused to impose strict liability on facts similar to those in this case, but again on the basis of a standard different from that of the Restatement. *Zero Wholesale Co. v. Stroud*, 264 Ark. 27, 571 S.W.2d 74 (1978), refused to hold that the delivery of propane gas was not an ultrahazardous activity as a matter of law. But the delivery in question was to a gas-storage facility, and the explosion occurred while gas was being pumped from the tank truck into a storage tank. This was a highly, perhaps unavoidably, dangerous activity.

*Siegler v. Kuhlman*, 81 Wash.2d 448, 502 P.2d 1181 (1972), also imposed strict liability on a transporter of hazardous materials, but the circumstances were again rather special. A gasoline truck blew up, obliterating the plaintiff's decedent and her car. The court emphasized that the explosion had destroyed the evidence necessary to establish whether the accident had been due to negligence; so, unless liability was strict, there would be no liability—and this as the very consequence of the defendant's hazardous activity. 81 Wash.2d at 454–55, 502 P.2d at 1185. But when the Supreme Court of Washington came to decide the *New Meadows* case, *supra,* it did not distinguish *Siegler* on this ground, perhaps real-

izing that the plaintiff in *Siegler* could have overcome the destruction of the evidence by basing a negligence claim on the doctrine of res ipsa loquitur. Instead it stressed that the transmission of natural gas through underground pipes, the activity in *New Meadows,* is less dangerous than the transportation of gasoline by highway, where the risk of an accident is omnipresent. 102 Wash.2d at 502–03, 687 P.2d at 216–17. We shall see that a further distinction of great importance between the present case and *Siegler* is that the defendant there was the transporter, and here it is the shipper.

Cases such as *McLane v. Northwest Natural Gas Co.,* 255 Or. 324, 467 P.2d 635 (1970); *Langlois v. Allied Chemical Corp.,* 258 La. 1067, 249 So.2d 133 (1971); *State Dept. of Environmental Protection v. Ventron,* 94 N.J. 473, 488, 468 A.2d 150, 157–60 (N.J.1983); *Cities Service Co. v. State,* 312 So.2d 799 (Fla.App.1975), and *Sterling v. Velsicol Chemical Corp.,* 647 F.Supp. 303, 315–16 (W.D.Tenn.1986), aff'd in part and rev'd in part, on other grounds, 855 F.2d 1188 (6th Cir.1988); but see *Standard Equipment, Inc. v. Boeing Co.,* 1987 U.S.Dist.Lexis 15137, at pp. *19–20 (W.D. Wash.1987), that impose strict liability for the storage of a dangerous chemical provide a potentially helpful analogy to our case. But they can be distinguished on the ground that the storer (like the transporter, as in *Siegler* ) has more control than the shipper.

So we can get little help from precedent, and might as well apply section 520 to the acrylonitrile problem from the ground up. To begin with, we have been given no reason, whether the reason in *Siegler* or any other, for believing that a negligence regime is not perfectly adequate to remedy and deter, at reasonable cost, the accidental spillage of acrylonitrile from rail cars. Cf. *Bagley v. Controlled Environment Corp.,* 127 N.H. 556, 560, 503 A.2d 823, 826 (1986). Acrylonitrile could explode and destroy evidence, but of course did not here, making imposition of strict liability on the theory of the *Siegler* decision premature. More important, although acrylonitrile is flammable even at relatively low temperatures, and

toxic, it is not so corrosive or otherwise destructive that it will eat through or otherwise damage or weaken a tank car's valves although they are maintained with due (which essentially means, with average) care. No one suggests, therefore, that the leak in this case was caused by the *inherent* properties of acrylonitrile. It was caused by carelessness—whether that of the North American Car Corporation in failing to maintain or inspect the car properly, or that of Cyanamid in failing to maintain or inspect it, or that of the Missouri Pacific when it had custody of the car, or that of the switching line itself in failing to notice the ruptured lid, or some combination of these possible failures of care. Accidents that are due to a lack of care can be prevented by taking care; and when a lack of care can (unlike *Siegler* ) be shown in court, such accidents are adequately deterred by the threat of liability for negligence.

It is true that the district court purported to find as a fact that there is an inevitable risk of derailment or other calamity in transporting "large quantities of anything." 662 F.Supp. at 642. This is not a finding of fact, but a truism: anything can happen. The question is, how likely is this type of accident if the actor uses due care? For all that appears from the record of the case or any other sources of information that we have found, if a tank car is carefully maintained the danger of a spill of acrylonitrile is negligible. If this is right, there is no compelling reason to move to a regime of strict liability, especially one that might embrace all other hazardous materials shipped by rail as well. This also means, however, that the amici curiae who have filed briefs in support of Cyanamid cry wolf in predicting "devastating" effects on the chemical industry if the district court's decision is affirmed. If the vast majority of chemical spills by railroads are preventable by due care, the imposition of strict liability should cause only a slight, not as they argue a substantial, rise in liability insurance rates, because the incremental liability should be slight. The amici have momentarily lost sight of the fact that the feasibility of avoiding accidents simply

by being careful is an argument *against* strict liability.

This discussion helps to show why *Siegler* is indeed distinguishable even as interpreted in *New Meadows*. There are so many highway hazards that the transportation of gasoline by truck is, or at least might plausibly be thought, inherently dangerous in the sense that a serious danger of accident would remain even if the truck-driver used all due care (though *Hawkins* and other cases are *contra*). Which in turn means, contrary to our earlier suggestion, that the plaintiff really might have difficulty invoking res ipsa loquitur, because a gasoline truck might well blow up without negligence on the part of the driver. The plaintiff in this case has not shown that the danger of a comparable disaster to a tank car filled with acrylonitrile is as great and might have similar consequences for proof of negligence. And to repeat a previous point, if the reason for strict liability is fear that an accident might destroy the critical evidence of negligence we should wait to impose such liability until such a case appears.

The district judge and the plaintiff's lawyer make much of the fact that the spill occurred in a densely inhabited metropolitan area. Only 4,000 gallons spilled; what if all 20,000 had done so? Isn't the risk that this might happen even if everybody were careful sufficient to warrant giving the shipper an incentive to explore alternative routes? Strict liability would supply that incentive. But this argument overlooks the fact that, like other transportation networks, the railroad network is a hub-and-spoke system. And the hubs are in metropolitan areas. Chicago is one of the nation's largest railroad hubs. In 1983, the latest year for which we have figures, Chicago's railroad yards handled the third highest volume of hazardous-material shipments in the nation. East St. Louis, which is also in Illinois, handled the second highest volume. Office of Technology Assessment, Transportation of Hazardous Materials 53 (1986). With most hazardous chemicals (by volume of shipments) being at least as hazardous as acrylonitrile, it is unlikely—and certainly not demonstrated by the plaintiff—that they can be rerouted around all the metropolitan areas in the country, except at prohibitive cost. Even if it were feasible to reroute them one would hardly expect shippers, as distinct from carriers, to be the firms best situated to do the rerouting. Granted, the usual view is that common carriers are not subject to strict liability for the carriage of materials that make the transportation of them abnormally dangerous, because a common carrier cannot refuse service to a shipper of a lawful commodity. Restatement, *supra*, § 521. Two courts, however, have rejected the common carrier exception. *National Steel Service Center, Inc. v. Gibbons*, 319 N.W.2d 269 (Ia.1982); *Chavez v. Southern Pacific Transportation Co.*, 413 F.Supp. 1203, 1213–14 (E.D.Cal.1976). If it were rejected in Illinois, this would weaken still further the case for imposing strict liability on shippers whose goods pass through the densely inhabited portions of the state.

The difference between shipper and carrier points to a deep flaw in the plaintiff's case. Unlike *Guille*, and unlike *Siegler*, and unlike the storage cases, beginning with *Rylands* itself, here it is not the actors—that is, the transporters of acrylonitrile and other chemicals—but the manufacturers, who are sought to be held strictly liable. Cf. *City of Bloomington v. Westinghouse Elec. Corp., supra*, 891 F.2d at 615–16. A shipper can in the bill of lading designate the route of his shipment if he likes, 49 U.S.C. § 11710(a)(1), but is it realistic to suppose that shippers will become students of railroading in order to lay out the safest route by which to ship their goods? Anyway, rerouting is no panacea. Often it will increase the length of the journey, or compel the use of poorer track, or both. When this happens, the probability of an accident is increased, even if the consequences of an accident if one occurs are reduced; so the expected accident cost, being the product of the probability of an accident and the harm if the accident occurs, may rise. Glickman, Analysis of a National Policy for Routing Hazardous Materials on Railroads (Department of Transportation, Research and Special Programs Administration, Transportation Systems Center, May 1980). It is easy to see how

the accident in this case might have been prevented at reasonable cost by greater care on the part of those who handled the tank car of acrylonitrile. It is difficult to see how it might have been prevented at reasonable cost by a change in the activity of transporting the chemical. This is therefore not an apt case for strict liability.

We said earlier that Cyanamid, because of the role it played in the transportation of the acrylonitrile—leasing, and especially loading, and also it appears undertaking by contract with North American Car Corporation to maintain, the tank car in which the railroad carried Cyanamid's acrylonitrile to Riverdale—might be viewed as a special type of shipper (call it a "shipper-transporter"), rather than as a passive shipper. But neither the district judge nor the plaintiff's counsel has attempted to distinguish Cyanamid from an ordinary manufacturer of chemicals on this ground, and we consider it waived. Which is not to say that had it not been waived it would have changed the outcome of the case. The very fact that Cyanamid participated actively in the transportation of the acrylonitrile imposed upon it a duty of due care and by doing so brought into play a threat of negligence liability that, for all we know, may provide an adequate regime of accident control in the transportation of this particular chemical.

In emphasizing the flammability and toxicity of acrylonitrile rather than the hazards of transporting it, as in failing to distinguish between the active and the passive shipper, the plaintiff overlooks the fact that ultrahazardousness or abnormal dangerousness is, in the contemplation of the law at least, a property not of substances, but of activities: not of acrylonitrile, but of the transportation of acrylonitrile by rail through populated areas. *Cropper v. Rego Distribution Center, Inc.*, 542 F.Supp. 1142, 1149 (D.Del.1982). Natural gas is both flammable and poisonous, but the operation of a natural gas well is not an ultrahazardous activity. Cf. *Williams v. Amoco Production Co.*, 241 Kan. 102, 115, 734 P.2d 1113, 1123 (1987). Whatever the situation under products liability law (section 402A of the Restatement), the manufacturer of a product is not considered to be engaged in an abnormally dangerous activity merely because the product becomes dangerous when it is handled or used in some way after it leaves his premises, even if the danger is foreseeable. *City of Bloomington v. Westinghouse Elec. Corp., supra*, 891 F.2d at 616–17; *Erbrich Products Co. v. Wills, supra.* The plaintiff does not suggest that Cyanamid should switch to making some less hazardous chemical that would substitute for acrylonitrile in the textiles and other goods in which acrylonitrile is used. Were this a feasible method of accident avoidance, there would be an argument for making manufacturers strictly liable for accidents that occur during the shipment of their products (how strong an argument we need not decide). Apparently it is not a feasible method.

The relevant activity is transportation, not manufacturing and shipping. This essential distinction the plaintiff ignores. But even if the plaintiff is treated as a transporter and not merely a shipper, it has not shown that the transportation of acrylonitrile in bulk by rail through populated areas is so hazardous an activity, even when due care is exercised, that the law should seek to create—perhaps quixotically—incentives to relocate the activity to nonpopulated areas, or to reduce the scale of the activity, or to switch to transporting acrylonitrile by road rather than by rail, perhaps to set the stage for a replay of *Siegler v. Kuhlman.* It is no more realistic to propose to reroute the shipment of all hazardous materials around Chicago than it is to propose the relocation of homes adjacent to the Blue Island switching yard to more distant suburbs. It may be less realistic. Brutal though it may seem to say it, the inappropriate use to which land is being put in the Blue Island yard and neighborhood may be, not the transportation of hazardous chemicals, but residential living. The analogy is to building your home between the runways at O'Hare.

The briefs hew closely to the Restatement, whose approach to the issue of strict liability is mainly *allocative* rather than *distributive.* By this we mean that the emphasis is on picking a liability regime

(negligence or strict liability) that will control the particular class of accidents in question most effectively, rather than on finding the deepest pocket and placing liability there. At argument, however, the plaintiff's lawyer invoked distributive considerations by pointing out that Cyanamid is a huge firm and the Indiana Harbor Belt Railroad a fifty-mile-long switching line that almost went broke in the winter of 1979, when the accident occurred. Well, so what? A corporation is not a living person but a set of contracts the terms of which determine who will bear the brunt of liability. Tracing the incidence of a cost is a complex undertaking which the plaintiff sensibly has made no effort to assume, since its legal relevance would be dubious. We add only that however small the plaintiff may be, it has mighty parents: it is a jointly owned subsidiary of Conrail and the Soo line.

The case for strict liability has not been made. Not in this suit in any event. We need not speculate on the possibility of imposing strict liability on shippers of more hazardous materials, such as the bombs carried in *Chavez v. Southern Pacific Transportation Co., supra,* any more than we need differentiate (given how the plaintiff has shaped its case) between active and passive shippers. We noted earlier that acrylonitrile is far from being the most hazardous among hazardous materials shipped by rail in highest volume. Or among materials shipped, period. The Department of Transportation has classified transported materials into sixteen separate classes by the degree to which transporting them is hazardous. Class number 1 is radioactive material. Class number 2 is poisons. Class 3 is flammable gas and 4 is nonflammable gas. Acrylonitrile is in Class 5. 49 C.F.R. §§ 172.101, Table; 173.-2(a).

Ordinarily when summary judgment is denied, the movant's rights are not extinguished; the case is simply set down for trial. If this approach were followed here, it would require remanding the case for a trial on whether Cyanamid should be held strictly liable. Yet that would be a mistake. The parties have agreed that the question whether the transportation of

acrylonitrile through densely populated areas is abnormally dangerous is one of law rather than of fact; and trials are to determine facts, not law. More precisely—for there is no sharp line between "law" and "fact"—trials are to determine adjudicative facts rather than legislative facts. The distinction is between facts germane to the specific dispute, which often are best developed through testimony and cross-examination, and facts relevant to shaping a general rule, which, as the discussion in this opinion illustrates, more often are facts reported in books and other documents not prepared specially for litigation or refined in its fires. Again the line should not be viewed as hard and fast. If facts critical to a decision on whether a particular activity should be subjected to a regime of strict liability cannot be determined with reasonable accuracy without an evidentiary hearing, such a hearing can and should be held, though we can find no reported case where this was done. Some courts treat the question whether an activity is abnormally dangerous as one of fact, and then there must be an evidentiary hearing to decide it. An example is *Zero Wholesale Gas Co. v. Stroud, supra,* 264 Ark. at 31, 571 S.W.2d at 76. Here we are concerned with cases in which the question is treated as one of law but in which factual disputes of the sort ordinarily resolved by an evidentiary hearing may be germane to answering the question. An evidentiary hearing would be of no use in the present case, however, because the plaintiff has not indicated any facts that it wants to develop through such a hearing.

Other issues are raised, but need not be decided. The plaintiff's claim that it is entitled to prejudgment interest is premature, since the judgment it obtained must be set aside. The defendant's alternative ground for reversal, that the switching yard assumed the risk of the abnormally dangerous activity by voluntarily participating (through its contract with Conrail) in the transportation of the tank car filled with acrylonitrile, Restatement, *supra,* § 523; *Clark v. Rogers,* 137 Ill.App.3d 591, 92 Ill.Dec. 136, 484 N.E.2d 867 (1985), is academic. (The argument is that the switching line was a participant in the ac-

tivity—even a joint tortfeasor—that has become transmogrified into a victim only because it incurred costs to prevent harm to the real victims of the accident.) Similarly, we need not decide whether the comprehensive regulations issued by the Department of Transportation under the Hazardous Materials Transportation Act, 49 U.S.C.App. §§ 1801 *et seq.*, which prescribe standards for the safe shipment of acrylonitrile by rail and, by requiring that such shipments be expedited, could be thought to authorize shipments via the most convenient rail hub even if it is located in a metropolitan area, would preempt a finding of common law liability premised on the assumption that such shipments should be rerouted. Those regulations are, however, relevant to showing that the shipments in question are not abnormally dangerous, and so support our rejection of strict liability whether or not the regulations are given preemptive effect. *New Meadows Holding Co. v. Washington Water Power Co., supra,* 102 Wash.2d at 501–02, 687 P.2d at 216; *Perkins v. F.I.E. Corp.,* 762 F.2d 1250, 1265–66 n. 43 (5th Cir.1985).

The defendant concedes that if the strict liability count is thrown out, the negligence count must be reinstated, as requested by the cross-appeal. We therefore need not consider the plaintiff's argument that the district judge was wrong to throw out the negligence count merely to create an appealable order. But we concede that the strong-arming that he had to do in order to create an appealable judgment casts doubt on the correctness of our previous decision. In refusing to accept the Rule 54(b) appeal, that decision emphasized the factual overlap between the negligence and strict liability counts. More recently we have suggested that factual overlap has been an overemphasized factor in our decisions interpreting and applying the rule. *Olympia Hotels Corp. v. Johnson Wax Development Corp.,* 908 F.2d 1363, 1367 (7th Cir. 1990). Perhaps we were thrown off the track in this case by the district judge's mention of the rule. We are now inclined to think that once he entered a judgment giving the plaintiff all the relief that it was seeking, the plaintiff's remaining ground merged in the judgment, which ended the case in the district court and therefore was appealable without the aid of Rule 54(b), even though, should such a judgment be reversed on appeal, the lawsuit would not be over, because the plaintiff had an alternative theory of liability. It is not over now. But with damages having been fixed at a relatively modest level by the district court and not challenged by the plaintiff, and a voluminous record having been compiled in the summary judgment proceedings, we trust the parties will find it possible now to settle the case. Even the Trojan War lasted only ten years.

The judgment is reversed (with no award of costs in this court) and the case remanded for further proceedings, consistent with this opinion, on the plaintiff's claim for negligence.

REVERSED AND REMANDED, WITH DIRECTIONS.