**E S ROBBINS CORPORATION
and Edward S. Robbins,
III, Plaintiffs,**

**v.**

**EASTMAN CHEMICAL COMPANY,
et al., Defendants.**

**No. CV 93–B–932–NW.**

United States District Court,
N.D. Alabama,
Northwestern Division.

Sept. 28, 1995.

Walter H. Monroe, Sid J. Trant, Bradley Arant Rose & White, Birmingham, AL, Gary C. Huckaby, Bradley Arant Rose & White, Huntsville, AL, for plaintiffs.

Henry Frohsin, Berkowitz Lefkovits Isom & Kushner, Birmingham, AL, Charles A. Perry, Rita A. Sheffey, Hunton & Williams, Atlanta, GA, for Eastman Chemical Products, Inc., Eastman Chemical United States Inc.

L. Tennent Lee, III, Burr & Forman, Huntsville, AL, for Younger Brothers Inc.

Henry Frohsin, Berkowitz Lefkovits Isom & Kushner, Birmingham, AL, Charles A. Perry, Hunton & Williams, Atlanta, GA, for Eastman Chemical Co.

## MEMORANDUM OPINION

BLACKBURN, District Judge.

Currently before the court is the motion of defendant Eastman Chemical Company ("Eastman") for summary judgment on Counts One through Seven of the Complaint [1] and on Eastman's motion to strike portions of the materials submitted by Robbins in opposing Eastman's motion for summary judgment. Upon consideration of the

---

1. Eastman has not moved for summary judgment on Counts Eight and Nine, which relate to contracts between Eastman and Robbins.

record, the submissions of the parties, the argument of counsel, and the relevant law, the court is of the opinion that the motion for partial summary judgment is due to be granted and that the motion to strike is due to be denied.

Plaintiffs E S Robbins Corporation and Edward S. Robbins, III (collectively "Robbins") seek to impose both CERCLA[2] and common law liability on Eastman[3] as the supplier of chemical products which Eastman sold to Robbins. Robbins claims that Eastman should be held liable for spills of a raw chemical product which allegedly occurred during off-loading of the product into Robbins's storage tanks from tank trucks owned and operated by independent contractor trucking companies.

In Count One of the Complaint, the CERCLA claim, Robbins alleges pursuant to Section 107(a) of CERCLA that Eastman is liable as the "owner or operator of a facility" from which there was a release of a hazardous substance, and as a person who "arranged" for the disposal or treatment of a hazardous substance. See 42 U.S.C.A. § 9607(a)(1) & (2) (West 1995). In Counts Two through Seven, the common law claims, Robbins seeks to impose liability on Eastman for alleged violations of the doctrine of abnormally dangerous activity (Count Two) and for wantonness (Count Three), negligence (Count Four), private nuisance (Count Five), public nuisance (Count Six), and trespass (Count Seven).

## FACTUAL BACKGROUND

Robbins owns and operates a vinyl products plant in Muscle Shoals, Alabama (the "Site"). (Complaint ¶¶ 12–14). The plant is located in an industrial area. (Pl.Ex.[4] A attached to Fowler[5] Aff. at 45). At the Site Robbins manufactures specialty vinyl products, including office products and environmental strip doors. (Complaint ¶ 12). In its manufacturing operations, Robbins has used certain chemicals, including di2–ethylhexyl phthalate or dioctyl phthalate, known as "Kodaflex DOP Plasticizer" and sometimes referred to as "DOP," and bis (2–ethylhexyl) adipate or dioctyl adipate, known as "Kodaflex DOA Plasticizer" or "DOA," (collectively "chemical product"),[6] most of which Robbins purchased from Eastman. (Complaint ¶¶ 15, 16; Def.Ex. A attached to memorandum in support of Eastman's motion for partial summary judgment ¶¶ 9, 11, 22; Finney[7] Depo. at 28–30).

Robbins purchased the chemical products from Eastman pursuant to written contracts containing standard Conditions of Sale providing that "[t]itle shall pass to buyer upon arrival of the material at destination in the United States on board common carrier." (See, e.g., Def.Ex. A & B attached to Kinsey[8] Aff.; Def.Ex. A attached to McBee[9] Aff. at ¶ 2). By their terms, the contracts are governed by Tennessee law, (see, e.g., Def.Ex. A

2. Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601, et seq.

3. The Complaint and Amendment to Complaint named four Eastman entities as defendants: Eastman Chemical Products, Inc., Eastman Chemical Company, Eastman Chemical United States, Inc., and Eastman Kodak Company, Inc. By Stipulation, all of the Eastman entities except Eastman Chemical Company were dismissed with prejudice. Eastman Chemical Company was the only Eastman entity named in the Second Amended Complaint (hereinafter referred to as "Complaint").

4. The exhibits submitted by Robbins in opposition to Eastman's motion for partial summary judgment will be referred to as "Pl.Ex."

5. William P. Fowler is an appraiser provided as an expert by Robbins. (See Pl.Ex. A attached to Fowler Aff.)

6. Although the Complaint references two types of phthalate esters allegedly sold by Eastman to Robbins, the exact identity of the products sold to Robbins by Eastman is not a material fact for the purposes of this motion. Accordingly, the Eastman product sold to Robbins is referred to as "chemical product."

7. Dean C. Finney is the Manager of Product Stewardship for the Polymer Modifiers Business Organization at Eastman. (Finney Depo. at 6). Mr. Finney has been in this position since May 1992 and was a Senior Technical Representative at Eastman from 1978 until May 1992. (Id. at 6–7).

8. Patrick R. Kinsey is the Director of Internal Auditing for Eastman. (Kinsey Aff. at ¶ 2).

9. John L. McBee was employed at Eastman from 1950 to 1986 and during his tenure served as Billing Clerk, Chief Clerk, and Supervisor of Sales Accounts. (McBee Aff. ¶ 2).

& B attached to Kinsey[10] Aff.; Def.Ex. A attached to McBee Aff. ¶ 14), and no special contractual arrangements were entered into or discussed with Robbins, (Cochrane[11] Aff. ¶ 7; Dubberly[12] Aff. ¶ 7; McBee Aff. ¶ 7; Moore[13] Aff. ¶ 7; Stooksbury[14] Aff. ¶ 4). The standard Conditions of Sale contained in the contracts also were contained in blanket orders, master orders, and order acknowledgments. (*E.g.*, Cochrane Aff. ¶ 5; Dubberly Aff. ¶ 5; McBee Aff. ¶ 5; Moore Aff. ¶ 5; Stooksbury Aff. ¶ 5). When a customer ordered a product from Eastman, Eastman routinely mailed to every customer, including Robbins, a form containing the "Conditions of Sale." (*E.g.*, Cochrane Aff. ¶ 6; Dubberly Aff. ¶ 6; McBee Aff. ¶ 6; Moore Aff. ¶ 6). These conditions have not changed materially since 1965. (Moore Aff. ¶ 5; *see also* McBee Aff. ¶ 4 & Ex. A).

All of the deliveries of Eastman's chemical product to Robbins were performed by common carriers or carriers with whom Eastman had entered into written contracts.[15] (Winkle[16] Aff. ¶ 6; Winkle Depo. at 17–18). The contracts specified that the trucking companies would perform their services as independent contractors. (Def.Ex. C. attached to Kinsey Aff. at ¶ 7). At least one contract does not specifically state that the trucking company shall function as an independent contractor. (*See* Pl.Ex. 31). Rather, the contract specifies that the services are to be provided "on a common, rather than contract, carrier basis." (Pl.Ex. 31). Eastman's chemical product was never delivered to Robbins in trucks owned or operated by Eastman. (Winkle Aff. ¶ 5). Robbins submitted evidence of numerous deliveries of chemical product to Robbins over a 15–year period. (*See* Pl.Ex. A–1 attached to Pl.Ex. 11).

The sale and transportation of the product took place as follows: Once Robbins placed an order with Eastman for a specific quantity of a particular product to be delivered to Robbins on a specific date and time, Eastman contacted one of the common or contract carriers. Eastman informed the carrier of the amount and type of product, the date and time for which the customer requested delivery, and any special customer requirements (*e.g.*, truck to be equipped for air unloading). (*E.g.*, Roberts[17] Depo. at 112–13, 156; Rule[18] Depo. at 45–46; Winkle Depo. at 223, 225–26; Corb[19] Depo. at 143–45; Jessee[20] Depo. at 62–63). On several occasions, Eastman sent a letter to one or more of its

10. Patrick R. Kinsey is the Director of Internal Auditing for Eastman. (Kinsey Aff. at ¶ 2).

11. James C. Cochrane was employed as an attorney in the Legal Department at Eastman from 1957 to 1985. (Cochrane Aff. ¶ 2).

12. Russell C. Dubberly was employed at Eastman from 1952 to 1991 and served as a Product Manager for Plasticizers in the United States from 1963 to 1970. (Dubberly Aff. ¶ 2).

13. Bruce E. Moore is Vice President of Sales for Asia Pacific and Latin America for Eastman. (Moore Aff. ¶ 2). From 1973 to 1975, Mr. Moore was a Product Manager for Plasticizers and Cellulose Esters in the United States. (*Id.*)

14. D.E. Stooksbury is Account Manager, U.S. Chemical Sales, at Eastman and has been employed by Eastman since 1961. (Stooksbury Aff. ¶ 2). Mr. Stooksbury was Marketing Representative for Coatings Chemicals Department (including plasticizers) for the Memphis area from 1972 to 1978. (*Id.* at ¶ 3).

15. A transportation contract entered into between Eastman and one carrier, Younger Brothers, provided that "Eastman shall not be responsible for any acts, omissions or liabilities of

carrier or its employees or agents." (Kinsey Aff. ¶ 6; Def.Ex. C attached to Kinsey Aff.).

16. L. Hedrick Winkle is Supervisor of Truck Services and Field Distribution, Domestic Distribution Services, at Eastman. (Winkle Aff. ¶ 2). He has been employed at Eastman since 1968. (*Id.*)

17. Carl R. Roberts worked in both the field traffic and tank truck areas at Eastman, assisting with the transportation of Eastman products. (Roberts Depo. at 9–11). Mr. Roberts is currently retired. (*Id.* at 7).

18. W. Walter Rule is employed in the Transportation and Field Distribution area at Eastman. (Rule Depo. at 9).

19. Jack S. Corb, Jr. was employed as Vice President of Safety at Younger Brothers, Inc., one of Eastman's carriers and a co-defendant in this lawsuit. (*See* Corb Depo. at 5–6).

20. Riley Jessee was Terminal Manager at Kingsport, Tennessee for Tidewater Transit Company, Inc. ("Tidewater") from 1989 to 1994. (Jessee Depo. at 14). Eastman was Tidewater's major shipper in Kingsport. (*Id.* at 9). Tidewater is a co-defendant in this lawsuit.

carriers reminding them of certain equipment requirements and driver procedures which Eastman expected to be followed in delivering product to Eastman's customers. (Pl.Ex. 120–22). Jack Corb, a former employee of Younger Brothers, stated in deposition that it is common knowledge in the industry that common carriers are often involved in the unloading process. (Corb Depo. at 279). In addition, Robbins submitted deposition testimony of several trucking company representatives to the effect that the carrier would stop unloading if Eastman told them to. (Corb Depo. at 209; Estel Depo. at 146–48). However, the carriers trained the drivers, not Eastman. (Campbell[21] Depo. at 112; Corb Depo. at 26; Durham[22] Depo. at 131–40).

Upon arrival at Robbins, the driver of the truck was met by a Robbins employee who took a sample of the product to check its quality and made a determination as to whether Robbins's storage tank had enough capacity to store the product being delivered. (Bacon[23] Aff. ¶ 3; Newton[24] Aff. ¶ 3; Austin[25] Aff. ¶ 3). The Robbins employee "direct[ed] the driver to the appropriate storage tank into which the products would be unloaded. The driver would then connect the hoses, unload the DOA and/or DOP, and then, disconnect the hoses." (Bacon Aff. ¶ 3; Newton Aff. ¶ 3; Austin Aff. ¶ 3). The Robbins employee was not usually present during the unloading process, (Bacon Aff. ¶ 3; Newton Aff. ¶ 3; Austin Aff. ¶ 3), but was provided with the material safety data sheets ("MSDS") for DOP and DOA. (Morrow[26]

Aff. ¶ 3; Bacon Aff. ¶ 9). Robbins alleges that, during off-loading of the chemical product at the Site, it was "deposited, discharged, dumped, leaked, placed, poured, released, and spilled ... onto and in the Property," resulting in contamination of the soil and possibly the groundwater at the Site. (Complaint ¶¶ 21, 22).

With regard to the allegation that transporting the raw product is abnormally dangerous, several trucking company employees testified in deposition to the risks inherent in transporting hazardous materials. (Corb Depo. at 186–87; Estel[27] Depo. at 217–18, 226–28). However, Mr. Corb testified that "as far as the nature of transportation and delivery," hazardous substances are transported "in the same manner" as any other product. (Corb Depo. at 186). In addition, Mr. Corb testified that he did not believe that unloading DOP posed a high degree of risk to persons and the environment. (See id. at 192–200; see also Estel Depo. at 175–77). Robbins also submitted evidence of Eastman's participation in the Chemical Manufacturer's Association ("CMA") Responsible Care program and Eastman's development of its Product Stewardship program. (See, e.g., Pl.Ex. 41–44, 55). These exhibits indicate that Eastman was evaluating the nature and extent of any risks associated with certain of its products.

Robbins presented evidence indicating the existence of soil contamination at Robbins, (Pl.Ex. A attached to Schutts[28] and Dew[29] Affidavits at 6–21), and evidence of spills at

---

**21.** Joe Campbell works in Domestic Distribution at Eastman. (Campbell Depo. at 9–10).

**22.** David Durham is the Safety Director at Central Transport, Inc., one of Eastman's carriers and a co-defendant in this lawsuit. (See Durham Depo. at 12).

**23.** Steve R. Bacon is the Technical Services/Safety Manager at Eastman. (Bacon Aff. ¶ 2). He served as a Lab Technician from 1978 to 1979. (Id.)

**24.** James D. Newton has been employed as a Lab Technician at Robbins since 1983. (Newton Aff. ¶ 2).

**25.** Charles D. Austin is an Extruder Operator at Robbins. (Austin Aff. ¶ 2). From May 1989 to February 1994, Mr. Austin performed some of the duties of lab technician, including meeting

the shipments from Eastman and directing the driver to the appropriate storage tank. (Id. at ¶¶ 2, 3).

**26.** Kathryn Morrow was the Director of Human Resources at Robbins from 1983 to 1992. (Morrow Aff. ¶ 2).

**27.** Edgar Estel is the Vice President of Safety at Superior Carriers, Inc., a co-defendant in this lawsuit. (See Estel Depo. at 26).

**28.** Larry Schutts is a expert geologist provided by Robbins. (See Schutts resume at Pl.Ex. A, App. E attached to Schutts Aff.).

**29.** Margaret E. Dew is an expert toxicologist provided by Robbins. (See Dew resume at Pl.Ex. A, App. E attached to Dew Aff.)

other locations by Eastman carriers, (*see, e.g.,* Pl.Ex. 80–84). In particular, plaintiffs submitted reports of Eastman customer complaints reporting spills and problems with Eastman carriers. (*Id.*) Some of these reports indicated that the spills were preventable with reasonable care. (*See, e.g.,* Pl.Ex. 85, 115, 120–22).

In some instances involving customers other than Robbins where an Eastman product was spilled at a customer's facility during off-loading of the product, Eastman credited the customer's account for the spilled material, and in turn filed a claim with the appropriate carrier who then reimbursed Eastman. (Ray[30] Depo. at 37–38; Campbell Depo. at 229–30, 233–34). In other circumstances, the customer determined that it did not have sufficient capacity to hold all of the product on the truck, and Eastman credited the customer's account for the amount of material not off-loaded into the customer's tank. (Ray Depo. at 102–23). In addition, Eastman made arrangements to have the remaining product either returned to Eastman or reconsigned to another customer. (*Id.; see also* Campbell Depo. at 14–17, 25–29). The cost of the additional transportation usually was borne by the customer, although in some instances it was paid by Eastman. (Ray Depo. at 112).

## SUMMARY JUDGMENT STANDARD

Under FED.R.CIV.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991); *see Adickes v. S.H.*

*Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *see* FED.R.CIV.P. 56(a) and (b).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id.*

After a properly made motion has been properly responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511. A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

---

**30.** Diane Ray is a Product Support Specialist at    Eastman. (Ray Depo. at 9).

sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 259, 106 S.Ct. at 2515; *see Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 745 n. 11, 103 S.Ct. 2161, 2171 n. 11, 76 L.Ed.2d 277 (1983). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510 (citations omitted); *accord Spence v. Zimmerman,* 873 F.2d 256 (11th Cir.1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson,* 477 U.S. at 254, 106 S.Ct. at 2513; *Cottle v. Storer Communication, Inc.,* 849 F.2d 570, 575 (11th Cir.1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston,* 848 F.2d 1534, 1540 n. 12 (11th Cir.1988).

## DISCUSSION

The issue presented by Eastman's motion for partial summary judgment is whether Eastman, as the manufacturer of a raw chemical product which Eastman sold to Robbins, has CERCLA or common law liability for costs and damages associated with environmental contamination allegedly resulting from spills of the product during off-loading into Robbins's storage tanks from tank trucks owned and operated by independent trucking companies.

### A. *CERCLA Claim (Count One)*

In order to prevail on its CERCLA claim, Robbins must show that Eastman is a "covered person" under CERCLA. CERCLA defines "covered persons" as (1) the current owner and operator of the facility; (2) a former owner or operator of the facility at the time of disposal of any hazardous substance at the facility; (3) persons who "arranged for" the disposal of a hazardous substance at the facility; and (4) persons who accept or accepted any hazardous substances for transport to disposal or treatment facilities, from which there is a release, or a threatened release of a hazardous substance. *See* 42 U.S.C.A. § 9607(a) (West 1995); *see also Florida Power & Light Co. v. Allis Chalmers Corp.,* 893 F.2d 1313, 1317 (11th Cir.1990); *United States v. Fleet Factors Corp.,* 901 F.2d 1550, 1553–54 (11th Cir.1990), *cert. denied,* 498 U.S. 1046, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991); *Redwing Carriers v. Saraland Apartments, Ltd.,* 875 F.Supp. 1545, 1551 (S.D.Ala.1995). Robbins seeks to hold Eastman liable as an "owner and operator" of a "facility," *i.e.,* the truck, at the time of disposal of a hazardous substance at or from the facility, *see* 42 U.S.C. § 9607(a)(2), and as a person who "arranged for" the disposal of a hazardous substance on Robbins's property, *see* 42 U.S.C. § 9607(a)(3).

### 1. *Owner or operator of facility at time of disposal*

Robbins argues that the trucks in which Eastman product was transported to Robbins were "facilities" [31] within the meaning of CERCLA and that Eastman owned and operated the trucks at the time the spills are alleged to have occurred during off-loading into Robbins's storage tank. The statute states that a person or entity may be held liable under CERCLA if the person "at the

---

**31.** The court notes that CERCLA defines "facility" to include motor vehicles, but excludes facilities containing "consumer product in consumer use." 42 U.S.C.A. § 9601(9) (West 1995). Because the chemical product transported in the trucks is used to manufacture consumer products, it may constitute "consumer product."

Therefore, the trucks may be excluded from the CERCLA definition of "facility." The court, however, does not decide this issue because Eastman's motion is due to be granted even assuming the trucks are facilities within the meaning of CERCLA.

time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C.A. § 9607(a)(2) (West 1995). The evidence is undisputed that Eastman did not own any of the trucks in which DOP was transported to Robbins.[32] Thus, the remaining issue is whether Eastman "operated" any of the trucks from which product was allegedly spilled.

The Eleventh Circuit has determined that "operator" liability under CERCLA requires an "active role in the actual management of the enterprise." *Jacksonville Elec. Auth. v. Bernuth Corp.*, 996 F.2d 1107, 1110 (11th Cir.1993) [hereinafter *"JEA"*]; *accord Redwing Carriers*, 875 F.Supp. at 1558. The JEA court found that the plain language of the statute leads to the conclusion that a person or entity "must actually supervise[ ] the activities of the facility" to be held liable as an "operator": "To inflict liability based on a showing of anything less would expand the language of the statute beyond the intent of Congress as expressed through the words of the legislation." *JEA*, 996 F.2d at 1110.

■ In this case Robbins has not presented sufficient evidence to enable a reasonable jury to conclude that Eastman "actually supervised the activities" of their carriers, such that Eastman could be held liable as an "owner or operator" under CERCLA. First, the evidence Eastman has provided makes clear that the trucking companies were independent contractors, not employees or agents of Eastman. The contracts between Eastman and the trucking companies specified that the trucking companies would perform their services as independent contractors. Robbins argues that at least one contract does not specifically state that the trucking company shall function as an independent contractor and that, therefore, deliveries pursuant to that contract were made by Eastman's agents. The contract specifies that the services are to be provided "on a common, rather than contract, carrier basis." Robbins argues that the distinction between common and contract carriers is important. However, the definition of "owner or opera-

tor" under CERCLA does not make a distinction between the two terms. Rather, the relevant inquiry under CERCLA is whether the carrier is "acting as an independent contractor":

(B) In the case of a hazardous substance which has been accepted for transportation by a common or contract carrier and except as provided in section 9607(a)(3) or (4) of this title, (I) the term "owner or operator" shall mean such common carrier or other bona fide for hire carrier acting as an independent contractor during such transportation, (ii) the shipper of such hazardous substance shall not be considered to have caused or contributed to any release during such transportation which resulted solely from circumstances or conditions beyond his control.

42 U.S.C.A. § 9601(20)(B) (West 1995). In this case, Eastman's carriers were acting as independent contractors. Eastman did not own any of the. trucks in which the product was delivered. Nor did any Eastman employee drive or ride in any of the trucks delivering product to Robbins or participate in or even observe the off-loading of product at Robbins. Once the carrier arrived at Robbins and tendered delivery of the product, a Robbins employee checked the paperwork accompanying the shipment, took a sample of the material to ensure that the product delivered was what was ordered, and determined whether its storage tank had capacity for the full shipment. Then, the Robbins employee directed the trucker into which tank to unload the product. These actions are consistent with the carrier's role as an independent contractor and show that the carriers were not subject to Eastman's control. The fact that the carriers were responsive to Eastman's instructions does not suggest an agency relationship. Rather, it indicates that Eastman was a consumer of the carriers' services and the carriers wanted to respond to their customer's needs. Robbins has not presented any evidence suggesting that Eastman's relationship with its carriers was

---

**32.** Eastman argues as a preliminary matter that it did not own the chemical product at the time that it was allegedly spilled because title of ownership passed to Robbins upon tender and accep-

tance of delivery. The court will not address this issue because liability under § 9607(a) does not require ownership of the product. *See* 42 U.S.C.A. § 9607(a) (West 1995).

anything other than what it purported to be—that of independent contractor.

Notwithstanding the legal relationship between Eastman and the various trucking companies which transported product to Robbins, Robbins claims that Eastman's actions nullify the contractual independent contractor status of the carriers and demonstrate that Eastman operated the trucks and thus controlled (or had the authority to control) the trucks during the off-loading of product. In order to survive Eastman's motion, Robbins must demonstrate sufficient facts to create a material issue whether Eastman's actions constitute control over the off-loading process. Robbins has failed to do so.

In support of their contention, Robbins relies heavily on several letters and memoranda from Eastman to the carriers, claiming that these letters show that Eastman actually controlled the carriers' actions. The evidence indicates that once Robbins ordered a specific quantity of a particular product to be delivered to Robbins on a specific date and time, Eastman contacted one of the common or contract carriers and informed the carrier of the amount and type of product, the date and time for which the customer requested delivery, and any special customer requirements (*e.g.*, truck to be equipped for air unloading). On several occasions, Eastman sent a letter to one or more of its carriers reminding them of certain equipment requirements and driver procedures which Eastman expected to be followed in delivering product to Eastman's customers. Those letters contained language such as "On all future tank truck shipments of Eastman DOP transported by your company, please insure that the enclosed equipment requirements and driver procedures are adhered to. Your cooperation will enable us to more readily meet our customer requirements." (Pl.Ex. 121). The "equipment requirements" included specifications of the type of tank truck (necessary to transport the product), the type of hoses to be used in unloading the product, etc. They also included a requirement that the driver carry a copy of the MSDS for the product. The "driver procedures" included requesting that the driver get instructions from the customer as to the unloading location and as to whether the customer's tank would hold all of the materi-

al. They also contained statements concerning the desirability of handling the hoses used for unloading in a certain way so as to avoid spills or leaks.

The court finds that the instructions contained in communications between Eastman and the carriers and the other evidence submitted by Robbins are insufficient to demonstrate that Eastman operated the trucks or had any authority to control the trucks during the off-loading of the chemical product. Considered in conjunction with the explicit language of the relevant contracts between Eastman and the common carriers, this evidence shows that Eastman simply communicated certain expectations and provided necessary information to enable the carriers to perform the transportation services for which Eastman contracted and the off-loading of product when requested by the customer. Similarly, the fact that carrier employees indicated that they would stop unloading if requested by Eastman does not indicate that Eastman "played an active role in the actual management of the enterprise." *See JEA,* 996 F.2d at 1110. Rather, this evidence simply suggests the carriers were willing to respond to Eastman's requests, presumably because Eastman was their employer:

> While "persons cannot escape liability by 'contracting away' their responsibility or by alleging that an incident was caused by the act or omission of a third party," the mere existence of economic bargaining power which would permit one party to impose certain terms and conditions on another does not itself create an obligation under CERCLA.

*General Electric Company v. AAMCO Transmissions, Inc.,* 962 F.2d 281, 286 (2d Cir.1992) (citation omitted).

The conclusion that Eastman does not constitute an "owner or operator" of a facility under CERCLA is supported by the Eleventh Circuit's decision in *JEA.* *JEA* involved a college which was the primary and later the sole shareholder of a company which owned a wood treatment plant. *JEA,* 996 F.2d at 1108. The *JEA* plaintiffs presented evidence indicating that while the college was either the primary or sole shareholder, the college dictated the terms of employment contracts between the company and the company's officers, approved a

profit sharing plan for the company, received reports on the status of the company's operations, changed the method of wood treatment at the facility, and carried on a business at the facility. *Id.* at 1110–11. Nevertheless, the court held that this evidence was insufficient to demonstrate that the college was actively involved in the company's occupational business affairs or that the college itself actually participated in the contamination. *Id.* at 1011. Therefore, the Eleventh Circuit affirmed the district court's grant of summary judgment. *Id.* Although the *JEA* court emphasized that the parent company was in an entirely different business than that of the subsidiary, *id.*, the level of control required by the court to find liability as an "owner or operator" is instructive.

The conclusion that Eastman is not an "owner or operator" is further supported by the holding in *Edward Hines Lumber Co. v. Vulcan Materials Co.*, 685 F.Supp. 651, 656 (N.D.Ill.), *aff'd*, 861 F.2d 155 (7th Cir.1988). In *Edward Hines*, the defendant was found not to be an "operator" in the context of CERCLA, even though the defendant had substantial involvement with a water treatment system for the facility. *Id.* 685 F.Supp. at 657. The defendant inspected the site prior to erection of a treatment system; designed, constructed, and erected the treatment system; hooked the plant up in preparation for its operation; trained plaintiffs' personnel who subsequently operated the facility; and enjoyed a right of access to the site. *Id.* at 656. Nevertheless, the *Edward Hines* court held this evidence insufficient to create a factual issue with regard to whether the defendant was an "operator" of the facility under § 9607(a)(2):

[T]hese facts if true do not establish that [the defendant] operated the ... site with-

in the meaning of § 9607(a)(2). ... [T]he clear language of § 9607(a)(2) imposes liability only upon those who actually operate a "facility" within the meaning of CERCLA. It does not include the designer or builder of a manufacturing system at a site containing the facility. ... The decisions imposing § 9607(a)(2) liability limit their reach to actual operators of a facility.

*Id.* at 656–57. As the Eleventh Circuit has stated, to be liable under § 9607(a)(2) "the person must play an active role in the actual management of the enterprise." *JEA*, 996 F.2d at 1110. Put another way, "'operator' liability under section 9607(a)(2) only attaches if the defendant had authority to control the cause of the contamination at the time hazardous substances were released into the environment." *Kaiser Aluminum & Chemical Corp. v. Catellus Development Corp.*, 976 F.2d 1338, 1341 (9th Cir.1992).

In this case Robbins has not presented sufficient evidence to create a genuine issue of material fact with regard to the level of control exercised by Eastman over its carriers' businesses. Although Robbins has presented evidence indicating that Eastman provided instructions as to the type of equipment they expected to be used and to some extent the safety precautions they expected to be taken during the unloading process, Eastman had no authority to control the conduct of their carriers' employees, nor did they attempt to exercise such control. Rather, the evidence Robbins has presented merely shows that Eastman was attentive to its customers needs and used its influence *as the consumer of its carriers' services* to ensure that Eastman's customers' needs were met. Therefore, Eastman is not liable as an owner or operator of any facility from which hazardous substances were released and is not a responsible party under § 9607(a)(2).[33]

**33.** In addition to their argument that Eastman is a "covered person" under § 9607(a), Robbins argues that Eastman should be held liable under CERCLA for any violations caused by the conduct of its carriers. Robbins argues that under common law, Eastman is liable as the employer of an independent contractor for physical harm to others if the work is such that "the employer should recognize [the work] as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken." *See* RESTATEMENT (SECOND) OF TORTS § 416 (1977). Robbins further cites *United States v.*

*Aceto Agric. Chem. Corp.*, 872 F.2d 1373, 1382 (8th Cir.1989), for the proposition that the sponsors of CERCLA anticipated that the common law would provide guidance in interpreting CERCLA. *See also Edward Hines*, 861 F.2d at 157. Robbins is correct that the Eighth Circuit affirmed the district court's decision to look to the common law for guidance in interpreting CERCLA. However, the district court stated clearly that it did not hold that CERCLA and the common law are co-extensive. *United States v. Aceto Agric. Chem. Corp.*, 699 F.Supp. 1384, 1390

### 2. Arranged for disposal

Robbins also seeks to impose CERCLA liability on Eastman by arguing that Eastman "arranged for" the disposal of a hazardous substance on Robbins's property, and thus is liable under 42 U.S.C. § 9607(a)(3). Section 9607(a)(3) provides:

> [A]ny person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances ... shall be liable.

42 U.S.C.A. § 9607(a)(3) (West 1995).

In support of its contention that Eastman "arranged for" the disposal of hazardous substances, Robbins states that it has submitted evidence that the chemical industry, including Eastman, was aware that in any transfer of chemical product, spills will occur. Robbins further contends that liability under § 9607(a)(3) is strict. Therefore, when Eastman arranged for transportation that it knew would lead to some spills, Robbins contends that Eastman arranged for disposal and should be held strictly liable under CERCLA.

■ Robbins is correct in its assertion that § 9607(a) imposes strict liability on responsible parties. See, e.g., United States v. Fleet Factors Corp., 901 F.2d 1550, 1554 (11th Cir.1990) (holding that § 9607(a)(1) imposes strict liability), cert. denied, 498 U.S. 1046, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991); Chatham Steel Corp. v. Brown, 858 F.Supp. 1130, 1138–39 (N.D.Fla.1994) (holding that § 9607(a)(3) does not include intent requirement). In addition, the Eleventh Circuit has refused to establish a per se rule excluding chemical suppliers from CERCLA liability. In doing so, the Court explained that a determination as to whether a supplier "otherwise arranged for disposal" must be made on a

case by case basis. Florida Power & Light, 893 F.2d at 1317. However, courts construing § 9607(a)(3) have required an actual arrangement for the disposal of a hazardous waste or the sale of a product which was essentially waste or scrap, no longer useful for its original purpose. See, e.g., id. at 1319 (affirming summary judgment where plaintiffs presented no evidence that manufacturers arranged for disposal by selling transformers); Amcast Indus. Corp. v. Detrex Corp., 2 F.3d 746, 751 (7th Cir.1993) (holding shipper not liable under § 9607(a)(3) where shipper arranged for delivery of useful product, not disposal of hazardous wastes), cert. denied, —— U.S. ——, 114 S.Ct. 691, 126 L.Ed.2d 658 (1994); Jordan v. Southern Wood Piedmont Co., 805 F.Supp. 1575, 1581 (S.D.Ga.1992) (holding manufacturer of chemical not liable under CERCLA because plaintiffs failed to show that sale of chemical was really an arrangement to dispose). Thus, "[i]f a party merely sells a product, without additional evidence that the transaction includes an 'arrangement' for the ultimate disposal of a hazardous substance, CERCLA liability would not be imposed." Florida Power & Light, 893 F.2d at 1317.

In Florida Power & Light, for example, the manufacturer of transformers containing PCBs sold the transformers to Florida Power & Light which used the transformers in the course of its business for forty years and then sold them for scrap. Id. at 1315. The Court declined to impose CERCLA liability on the manufacturer because there was no proof that the sale to Florida Power & Light included an · arrangement for the ultimate disposal of the product. Id. at 1317. Similarly, the court in Jordan held that the manufacturer and vendor of a chemical used in a wood processing plant was not a "covered person" under § 9607(a), even though plaintiffs presented evidence showing that the manufacturer communicated to plaintiffs its expertise and offered to assist its customers in handling the chemicals. Jordan, 805

(S.D.Iowa 1988), aff'd in part, rev'd in part, Aceto, 872 F.2d 1373 (8th Cir.1989). Rather, the court stated that "where the statutory language and legislative history of CERCLA are inconclusive," the common law is an appropriate source of guidance. Id. In this case, the court finds that the statutory language and law interpreting the

statute lead to the conclusion that Eastman is not a "covered person" under CERCLA. Therefore, the court does not look to the common law to determine whether Eastman is liable for the actions of its independent contractors under CERCLA. Robbins's separate common law claims are addressed in Section B of this Opinion.

F.Supp. at 1580–81. The *Jordan* court held that plaintiffs' evidence was insufficient to suggest that in selling the chemicals, the manufacturer was really arranging for their disposal. *Id.* at 1581.

Robbins distinguishes these cases by asserting that this case does not involve the sale of products which were disposed of years later by the purchaser. Rather, in this case the spill of the hazardous substances occurred contemporaneously with the delivery of those products. Although the Eleventh Circuit has not addressed the specific factual scenario presented by this case, the Seventh Circuit considered this issue in *Amcast*, 2 F.3d at 746. In *Amcast*, the Seventh Circuit held that the chemical manufacturer was not liable for spills during deliveries made by drivers employed by, and in trucks owned by, a common carrier. *Amcast*, 2 F.3d at 751. The *Amcast* court concluded that "the spiller, but not the shipper of the chemical that spilled, is within [CERCLA's] long reach." *Amcast*, 2 F.3d at 747. The court stated:

> [W]hen the shipper is not trying to arrange for the disposal of hazardous wastes, but is arranging for the delivery of a useful product, he is not a responsible person within the meaning of the statute.... It would be an extraordinary thing to make shippers strictly liable under the Superfund statute for the consequences of accidents to common carriers or other reputable transportation companies that the shippers had hired in good faith to ship their products.

*Id.*, 2 F.3d at 751.[34]

■ The reasoning and result in *Amcast* apply here. In this case there is no evidence that in selling the chemical product to Robbins, Eastman was really arranging for their "ultimate" disposal. *See Florida Power & Light*, 893 F.2d at 1317. Robbins states that it has produced evidence showing that Eastman knew that some amount of the product would be spilled as a result of the transporta-tion of the chemicals. However, the customer complaint memoranda and deposition testimony merely confirm that some spills have occurred in the past; they do not confirm that spills are so likely to occur that in arranging for the transportation of the chemical product, Eastman was really arranging for their ultimate disposal. In fact, some of the memoranda indicate that such spills were preventable with reasonable care and that Eastman actively took steps to prevent them. (*See, e.g.*, Pl.Ex. 115, 120–22). Robbins also seems to suggest that the fact that Eastman was actively studying the dangers of shipping chemicals indicates that Eastman was aware that shipping necessarily involved the disposal of some of the chemical product in the form of spills. Robbins further notes that Eastman was concerned enough to communicate to its carriers specific expectations with regard to the handling of the chemicals. However, the fact that Eastman was aware of the risks involved in transporting the chemicals and wanted to ensure that the chemicals were handled safely does not lead to the conclusion that Eastman "arranged for" their disposal. The *Jordan* court reached the same conclusion in response to a similar argument that because the manufacturer in *Jordan* sent the plaintiffs bulletins with information regarding the safe handling of the chemicals and offered technical assistance, they arranged for their disposal. *Jordan*, 805 F.Supp. at 1580. As the *Jordan* court stated:

> Adoption of Plaintiffs' arguments, without concrete evidence establishing those bulletins as an attempt by [defendant] to arrange for the disposal of chemicals, would discourage chemical manufacturers from offering expertise to those experiencing problems and thereby increase the risk of future hazardous waste incidents. Such a result is decidedly contrary to the intent of CERCLA.

---

**34.** The court in *Amcast* distinguished between deliveries made by common carriers and those made in the manufacturer's own trucks. The court declined to hold the manufacturer liable for deliveries made by common carriers, but did hold the manufacturer liable for arranging for the disposal of hazardous substances for deliver-ies that were made by the manufacturers' drivers in the manufacturer's trucks. *Amcast*, 2 F.3d at 751. The evidence is undisputed that none of the deliveries of Eastman's chemical product to Robbins were made by Eastman drivers in Eastman trucks.

*Id.* Robbins has not provided sufficient evidence for a reasonable jury to find that when Eastman sold Robbins the chemical product and contracted for its delivery, it was really arranging for the disposal of the chemicals.

Although Robbins relies on *Chatham Steel,* 858 F.Supp. at 1130, in its brief, the court's decision in that case further supports this court's conclusion that Eastman did not arrange for the disposal of any hazardous material at Robbins. Unlike *Florida Power & Light, Amcast,* and *Edward Hines,* each of which involved the sale of a useful product and in which the respective courts found no liability, *Chatham Steel* involved the sale of spent batteries and led to a finding of liability. *Id.* at 1140. As the district court noted in *Chatham Steel,* there was no evidence in that case that the batteries were capable of being used as batteries; rather, they were essentially scrap. *Id.* at 1140–41. Therefore, the *Chatham* court found that the very nature of the sale indicated that "when [the defendants] sold spent batteries to a battery recycler . . . [they] 'arranged for the disposal or treatment' of a hazardous substance." *Id.* at 1141 (citation omitted). The *Chatham* court noted that its conclusion was "bolstered" by comparing the case to the decisions in *Edward Hines* and *Prudential Insurance Co. v. United States Gypsum,* 711 F.Supp. 1244 (D.N.J.1989), both of which involved the sale of new chemicals intended to serve a particular, intended purpose, and each of which held that the defendants were not liable under § 9607(a)(3). *Id.* at 1140. Although the *Chatham Steel* court disagreed with the *Amcast* opinion to the extent that *Amcast* is read as requiring *intentional* action, the *Chatham Steel* court provides further support for the proposition that a manufacturer who sells a "useful product" to a buyer is not arranging for the disposal of that product.

### 3. *Conclusion*

Having found that Eastman was not an "owner or operator" and that Eastman did not arrange for the disposal of a hazardous substance, the court concludes that Eastman is not a "covered person" as contemplated under § 9607(a) and the court will grant Eastman's motion for summary judgment as to Count One of the Complaint.

### B. *Common law claims (Counts Two through Seven)*

In addition to the CERCLA claim, Eastman's motion asks for summary judgment on Counts Two through Seven, all of which involve common law claims concerning the delivery of the chemical product. As an initial matter, the court must determine whether Eastman can be held liable under common law for the actions of its independent contractor. Robbins argues that Eastman should be held liable for the torts of its carriers under Sections 416, 427, and 427A of the Restatement (Second) of Torts, despite the independent contractor relationship.

Section 416 of the Restatement (Second) of Torts provides that an employer who hires an independent contractor to do work which "the employer should recognize as likely to create . . . a peculiar risk of physical harm to others unless special precautions are taken" is subject to liability for physical harm caused by the independent contractor's failure to exercise reasonable care to take such precautions. RESTATEMENT (SECOND) OF TORTS § 416 (1977). According to the Restatement, this liability attaches even if the employer has provided for such precautions in the contract or otherwise. *Id.* A parallel provision, Section 427 of the Restatement, provides that an employer who hires an independent contractor to do work "involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work . . . is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger." *Id.* at § 427. Both of these provisions state the same general rule that the employer remains liable for injuries resulting from the negligence of the contractor where the work involves dangers which the employer should contemplate because of the "inherent risk" of danger in the activity contemplated by the contract. *See id.* at § 416 cmt. a; *see also Clark v. Container Corp. of America, Inc.,* 936 F.2d 1220, 1224–25 (11th Cir.1991) (discussing the liability of an employer who hires an independent contractor to perform inherently and intrinsically dangerous activities).

Robbins also argues that Eastman should be held strictly liable under Section 427A of the Restatement. Section 427A provides that an employer who hires an independent contractor to do work which the employer "knows or has reason to know to involve an *abnormally dangerous activity,* is subject to liability *to the same extent as the contractor* for physical harm to others caused by the activity." *Id.* at § 427A (emphasis added). Unlike Sections 416 and 427, which only subject the employer to liability if the independent contractor fails to use reasonable precautions, Section 427A subjects the employer to liability for *any* physical harm caused by the activity, regardless of whether the independent contractor was negligent. *See id.*

In this case Robbins argues that the transportation and off-loading of the chemical product constitutes an *abnormally* dangerous activity which caused physical harm to others, for which Eastman should be held strictly liable as the employer of the independent contractor who unloaded the product. Alternatively, Robbins argues that the transportation and off-loading of the chemical product is an *intrinsically and inherently* dangerous activity, for which Eastman should be liable even if the alleged negligence can only be attributed to Eastman's carriers.

### 1. *Strict Liability (Count Two)*

With regard to the issue of whether the transportation and delivery of a hazardous substance constitutes an abnormally dangerous activity warranting the imposition of strict liability, Robbins has identified no case imposing strict liability on a manufacturer for spills during the off-loading of a liquid chemical from a tank truck into an aboveground storage tank. Indeed, in Alabama, that doctrine has been limited primarily to blasting cases. *See, e.g., IMAC Energy, Inc. v. Tittle,* 590 So.2d 163 (Ala.1991); *Harper v. Regency Dev. Co.,* 399 So.2d 248 (Ala.1981). Other courts, however, have specifically considered this issue and held that the transportation and off-loading of a liquid chemical product is not abnormally dangerous. For example, in *Indiana Harbor Belt R.R. v.*

American Cyanamid Co., 916 F.2d 1174, 1182 (7th Cir.1990), the Seventh Circuit held that the manufacturer and shipper of a hazardous chemical could not be held strictly liable for a spill that occurred en route because the transportation of the chemical was not abnormally dangerous. *Id.* at 1182. The *Indiana Harbor* court held that the manufacturer was not strictly liable, even though the manufacturer participated actively in the transportation of the chemical. *Id.* at 1181–82. The court reasoned that the relevant inquiry is not the extent of participation by the manufacturer, but rather whether the chemical was so dangerous that its *transportation* constitutes an abnormally dangerous activity warranting the imposition of strict liability. *Id.* at 1181; *see also Amcast Indus. Corp. v. Detrex Corp.,* 779 F.Supp. 1519, 1544 (N.D.Ind.1991), *aff'd in part, rev'd in part,* 2 F.3d 746 (7th Cir.1993) (holding that transportation and delivery of hazardous substance is not abnormally dangerous activity).

As a general rule, an activity is not abnormally dangerous, such that the imposition of strict liability is warranted, unless it is an activity "which cannot be performed safely even in the absence of negligence and with the exercise of all reasonable care." *Clark,* 936 F.2d at 1225. Thus, the fact that activities pose some risk of harm either to the environment or to humans does not mean that the activities are abnormally dangerous. In this case, Robbins has not produced any evidence indicating that the chemical product *cannot* be transported and off-loaded safely; in fact, the evidence indicates that safe handling and transportation were the norm, rather than the exception.[35] Therefore, as a matter of law, the transportation and delivery of the chemical product does not constitute an abnormally dangerous activity.

Robbins argues, however, that the factors of Section 520 of the Restatement (Second) of Torts support imposing strict liability upon Eastman. The Alabama Supreme Court recognized this section of the Restatement in *Harper,* 399 So.2d at 253. Section 520 of the

---

**35.** Although Robbins has presented customer complaint memoranda and deposition testimony that spills have occurred, the evidence only refers to a handful of instances and Robbins has also produced evidence indicating that Eastman made hundreds of deliveries to Robbins alone over a 15–year period. (*See* Pl.Ex. A–1 attached to Pl.Ex. 11).

Restatement sets forth six factors that must be taken into consideration when determining whether an activity is abnormally dangerous: (1) the existence of a high degree of risk of some harm to the person, land, or chattel of others; (2) the likelihood that the harm that results will be great; (3) the inability to eliminate the risk by the exercise of reasonable care; (4) the extent to which the activity is not a matter of common usage; (5) the inappropriateness of the activity to the place where it is carried on; and (6) the extent to which its value to the community is outweighed by its dangerous activities. RE-STATEMENT (SECOND) OF TORTS § 520 (1977).

In this case, Robbins has failed to produce sufficient evidence from which a reasonable jury could find that the transportation and delivery of the chemical product at issue in this case is an abnormally dangerous activity under Section 520 of the Restatement (Second) of Torts. With regard to the first factor, the existence of a high degree of risk of some harm, the evidence submitted by Robbins consists primarily of deposition testimony of several trucking company employees who stated that there are some risks involved in the transportation of hazardous substances. However, none of these individuals is an expert regarding the toxicology or the chemistry of hazardous substances. In addition, Mr. Corb, former employee of Younger Brothers, testified that "as far as the nature of transportation and delivery," hazardous substances are transported "in the same manner" as any other product. (Corb Depo. at 186). Mr. Corb also testified that he did not believe that unloading the chemical product posed a high degree of risk to persons and the environment. Therefore, although there appears to be some risk that the chemical will spill, it is not clear that there is a "high degree of risk" that the chemical will spill or that if there is a spill, the spill will be of such a quantity as to injure others.

In support of the second factor of Section 520, the likelihood that the harm that results would be great, the only evidence the court finds relevant is that of the presence at Robbins of soil contamination. Robbins has provided an expert report indicating the suspected levels of contamination, but the full extent of the contamination is unknown. Because the court considers all evidence in favor of the nonmoving party on a motion for summary judgment, the court will consider this factor to weigh in favor of Robbins.

Nevertheless, the court finds that each of the remaining factors of Section 520 favors Eastman. The third factor is the inability to eliminate the risk by the exercise of reasonable care. As stated above, Robbins has failed to demonstrate that the risk of release during off-loading cannot be eliminated by the exercise of reasonable care. Robbins has submitted documents indicating that in some instances, at customer facilities other than Robbins, there were spills of product during the off-loading from the truck into a storage tank. There is no evidence, however, that the proportion of spills in relation to the number of shipments is significant. Indeed, some of the evidence submitted by Robbins indicates that such spills were preventable with reasonable care.

The fourth factor of Section 520 is the extent to which the activity is not a matter of common usage. Robbins's only argument in support of this factor is a simple statement to that effect. The court finds, however, that Robbins's own evidence of numerous deliveries of raw product to Robbins over a 15–year period favors Eastman on this point. Finally, the court notes that the chemical which Eastman sold to Robbins was commonly used in products manufactured by Robbins and others.

Finally, the fifth and sixth factors favor Eastman. Robbins found the chemical product to be useful in manufacturing consumer products for over fifteen years. With regard to the appropriateness of the activity to the place where it is carried on, the delivery of the chemical product occurred at Robbins's manufacturing facility. Therefore, Robbins determined where to locate the manufacturing facility, where to build the storage tanks, and directed where the raw product was to be delivered. In addition, Robbins has produced no evidence indicating that its location of its manufacturing facility or storage tanks was inappropriate. Robbins has not presented any evidence suggesting either that it was inappropriate to deliver the chemical product at the Robbins facility or that the dangerous attributes of the delivery process outweighed

its value to the community. Taken as a whole, therefore, the factors under Section 520 compel the conclusion that the handling and off-loading of the chemical product is not an abnormally dangerous activity. The court finds that the material facts are undisputed and thus concludes that Eastman is entitled to judgment as a matter of law on Count Two of the Complaint.

*Negligence* [36]

■ Robbins has also failed to produce sufficient evidence suggesting that Eastman is liable for the alleged negligence of its carriers under Restatement (Second) of Torts Sections 416 and 427, dealing with inherently or intrinsically dangerous activities. Both restatement sections provide that an employer of an independent contractor will be liable for "physical harm" caused by the negligence of an independent contractor while engaged in an inherently or intrinsically dangerous activity. *See* RESTATEMENT (SECOND) OF TORTS §§ 416, 427 (1977). Although courts have had some difficulty defining what constitutes an "inherently or intrinsically dangerous activity," the Alabama Supreme Court defined it in *Borden v. Consumer Warehouse Foods, Inc.*, 601 So.2d 976 (Ala.1992):

> [A]n intrinsic danger in an undertaking " ... is one which inheres in the performance of the contract and results directly from the work to be done, not from the collateral negligence of the contractor, and important factors to be understood and considered are the contemplated conditions under which the work is to be done and the known circumstances attending it."

*Id.* at 978 (citation omitted). In this case, Robbins has produced some evidence suggesting that the transportation and delivery of the chemical product was of a nature such that certain precautions should be taken to ensure the safety of the personnel and the property. However, Robbins has not produced sufficient evidence to indicate that without such precautions " 'injury would *probably* result.' " *See Clark*, 936 F.2d at 1225; *cf. Jones v. Power Cleaning Contractors*, 551 So.2d 996 (1989) (involving chemical so dangerous that one drop blinded plaintiff

in one eye). In fact, Mr. Corb, on whose testimony Robbins particularly relies, stated that hazardous substances are transported "in the same manner" as all other products. Therefore, Robbins has not presented sufficient evidence from which a jury could reasonably conclude that merely transporting and off-loading the chemical product was inherently or intrinsically dangerous, such that Eastman could not delegate that duty under Sections 416 and 427 of the Restatement (Second) of Torts.

1. *Wantonness (Count Three) and Negligence (Count Four)*

Robbins alleges, in Counts Three and Four of the Complaint, that Eastman owed or assumed a duty to Robbins to properly handle, deliver and transfer the chemical product and that Eastman wantonly and negligently failed to train or supervise their carriers in this regard "while on the Property." (Complaint ¶¶ 38–40, 44–46). Robbins also alleges that Eastman wantonly and negligently handled, delivered, transferred, and disposed of the chemical product at the Site. (*Id.* at ¶¶ 41, 47). Robbins claims that such a duty arose in one of two ways, either through the assumption of a duty or through the imposition of a duty based upon industry standard.

Robbins relies on *Industrial Chemical & Fiberglass Corp. v. Chandler*, 547 So.2d 812 (Ala.1988) for the proposition that "those who deal with dangerous instrumentalities, such as explosives or chemicals, must exercise a great amount of care because the risk is great." *Id.* at 831. While the general proposition is true, Robbins has failed to demonstrate either that Eastman had any duty or that Eastman failed to fulfill any duty to Robbins regarding off-loading of the product. In *Chandler*, the defendant failed even to provide a MSDS or a technical bulletin concerning the product. *Id.* There is no such claim here. Robbins has admitted that Eastman provided them with the MSDS for DOP, and there is no evidence that Eastman had any duty to Robbins which it did not fulfill. In addition to providing Robbins with the MSDS and certain technical information

---

**36.** Count Two only alleges strict liability for abnormally dangerous activity. However, in Paragraph 18A of the Complaint, Robbins appears to

claim that Eastman is also liable under Sections 416 and 427 of the Restatement.

about the product, Eastman advised Robbins that Eastman personnel were available to answer any questions and to provide technical assistance. There is no evidence that Robbins ever asked Eastman for technical assistance or advice and that Eastman refused.

#### a. *Assumption of duty*

Robbins argues that Eastman *assumed* a duty to off-load the product at Robbins. However, the cases cited by the Robbins in support of imposing liability on Eastman are distinguishable because they all involved *active* control of the activity by the defendant. For example, in *Walden v. United States Steel Corp.,* 759 F.2d 834 (11th Cir.1985), the plaintiff's husband, a miner, was killed when struck by a falling bucket while working at the bottom of a vertical shaft which his employer, an independent contractor, was sinking for the owner of the mine. *Id.* at 835–36. In finding the mine owner negligent, the court emphasized the active involvement of the mine owner in the operation and safety concerns of the facility. *Id.* at 837. The court noted that the mine owner's employee had been involved in the day-to-day planning to determine the best method of extracting the coal and connecting the shafts, was in the shafts almost daily, had an intimate knowledge of applicable regulations, was aware of safety requirements, checked the equipment, made suggestions for improvements, and voluntarily undertook safety inspections. *Id.* at 836–37.

Similarly, the Alabama Supreme Court held in *Palomar Ins. Corp. v. Guthrie,* 583 So.2d 1304 (Ala.1991), that a jury could reasonably find that a motor vehicle insurer and customer sales representative assumed a duty to notify the insured of the time for renewal and the time of lapse of the policy, where they had handled all of the plaintiff's commercial insurance needs for three years, provided him with copies of policies, and in prior years sent him renewal notices. *Id.* at 1307. Finally, in *Stauffer Chem. Co. v. Brunson,* 380 F.2d 174 (5th Cir.1967),[37] the court found that where a contract provided that a construction company would discharge

sulphur from barges and assume full responsibility for all damage to the cargo occurring during the time that the barges were in the construction company's possession, the cargo owner's assumption of a duty to watch the barges at night relieved the construction company of all responsibility for the barges and the sulphur during the night hours. *Id.* at 182. The court held that construction company thus was not responsible for any damage resulting from the cargo owner's neglect in not performing its assumed duty with reasonable care. *Id.*

■ In this case Robbins has failed to present sufficient facts from which a jury could reasonably find that Eastman assumed a duty of care with regard to the transportation and off-loading of the chemical product at the Site. Although Eastman gave the trucking companies information and directions as to where and when to deliver product to Eastman's customers and provided the carriers with specifications regarding equipment to be used in transporting and off-loading the product, the mere providing of instructions and suggestions does not result in an assumption by Eastman of a duty to off-load the material or to do so in any particular manner. The fact that some of the trucking company employees stated that they would stop unloading if so directed by Eastman does not change this conclusion because Eastman still did not have control over the conduct which allegedly caused the spill. Eastman's participation was not *active* as required under *Walden, Palomar,* and *Stauffer.* Therefore, the court finds that Eastman's participation was not of the nature to support a finding that Eastman assumed a duty of care toward Robbins with regard to the off-loading procedures.

#### b. *Industry standard*

In support its contention that there is an industry standard requiring Eastman to off-load the product "in a non-negligent and non-wanton manner," Robbins cites the deposition testimony of Jack Corb, former employ-

---

**37.** The Eleventh Circuit has held that all decisions of the United States Court of Appeals for the Fifth Circuit handed down by that court on or before September 30, 1981, shall be binding as precedent in the Eleventh Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir. 1981).

ee of Younger Brothers. (Pl.Brief at 15). However, Mr. Corb's testimony does not support an industry standard for chemical suppliers or any duty on the part of Eastman to off-load the products it sells. At most, Mr. Corb's testimony indicates that he understood that Younger Brothers employees were to assist in off-loading the product. Mr. Corb's testimony in no way suggests a certain standard of care, and Robbins does not cite any other testimony as support for its contention that there is a duty of care owed by the manufacturer and shipper of a chemical product to the buyer with regard to the off-loading of the chemical product.

In addition, Robbins relies heavily on a number of documents relating to the CMA Responsible Care Program adopted by Eastman, one portion of which focuses on Product Stewardship. As the court understands the evidence presented, Eastman, like other chemical manufacturers, is a member of the CMA. The CMA initiated a program pursuant to which its members, including Eastman, agreed to undertake a program designed to evaluate and to minimize any risks associated with the handling, use, and storage of Eastman's products. A key element of that plan is the recognition that Eastman, Eastman's carriers, and the customers each have certain responsibilities regarding safety. None of the evidence submitted by Robbins contained in the CMA material imposes a duty on Eastman to ensure that a particular method or technique is used to off-load Eastman product at a customer's facility. The documents simply show that Eastman (and other manufacturers who are members of the CMA) is studying a wide array of safety and health-related factors concerning their products.[38]

■ The court thus concludes that there was no industry standard imposing a duty on a manufacturer to off-load a product in a particular manner. Nor did Eastman have or assume any duty to Robbins regarding the off-loading of product at Robbins. Because the court finds that Eastman is not liable for the torts of its carriers and because Robbins has failed to produce sufficient evidence to suggest that Eastman owed Robbins a duty of care with regard to the transportation and off-loading of the chemical product, the court concludes that, as a matter of law, Eastman is entitled to summary judgment on Counts Three and Four of the Complaint.

### 2. Private Nuisance (Count Five), Public Nuisance (Count Six), and Trespass (Count Seven)

In Counts Five, Six, and Seven of the Complaint, Robbins alleges that Eastman is responsible for the alleged contamination in the soil and groundwater at the Site and that such contamination constitutes a private and a public nuisance under Alabama Code §§ 6–5–120, 6–5–121, and 6–5–124, and an actionable trespass under Alabama Code § 6–5–210, *et seq.* (Complaint ¶¶ 51, 55, 60).

---

**38.** Even though some of the Eastman documents contain information regarding the safe handling of Eastman products, including procedures for unloading the product, (*e.g.,* Pl.Ex. 24), those documents also include an introduction specifying the purpose of the document and cautioning the customer to use the information only as guidance:

This publication provides information for storage of Kodaflex plasticizers, tank construction materials, and unloading tank cars and tank trucks. *The discussion and drawings are given as information only and should be used solely as a guide in developing procedures and facilities for handling these materials. Customers should determine for themselves the appropriate procedures and facilities for their operations.* The information in this publication, along with the data and information contained in Eastman's Material Safety Data Sheets (MSDS), needs to be reviewed and understood to help assure the safe handling of *Eastman* plasticizers.

Local and state regulations regarding the handling and storage of chemicals may vary widely. The federal Occupational Safety and Health Administration (OSHA), Environmental Protection Agency (EPA), National Fire Protection Association (NFPA), and a user's insurance company also impose safety standards. In addition, the U.S. Department of Transportation (DOT) prescribes rules and regulations for unloading of hazardous materials from tank cars and tank trucks (see 49 CFR 100–199). Knowledge of these and other appropriate federal and state laws and regulations as well as consultation with the proper authority should provide guidance for developing adequate handling procedures and constructing appropriate storage facilities.

(Pl.Ex. 24 (emphasis added)).

**1494**

The gravamen of a claim of public or private nuisance or trespass is that there has been an intrusion which interferes with a landowner's use of the property. *Borland v. Sanders Lead Co.*, 369 So.2d 523, 528 (Ala. 1979). Further, the elements of legal duty and causation between the "conduct or activity complained of and the hurt, inconvenience, or damage sued for," must be met in order to establish a statutory nuisance claim in Alabama. *Tipler v. McKenzie Tank Lines*, 547 So.2d 438, 440 (Ala.1989).

Eastman cannot be held liable for any alleged contamination at the Site because Eastman had no control over the off-loading of product by its carriers or Robbins. Further, Eastman's duty to Robbins was to tender delivery of useful raw product to Robbins at the Site in accordance with the contract. Eastman did so. After tender and acceptance of delivery occurred, Eastman's performance was complete. Moreover, if the alleged contamination is the result of any conduct of Eastman's carriers, Eastman similarly cannot be held liable because those carriers were independent contractors. In addition, the carriers were on Robbins's property with Robbins's permission and only off-loaded the product after a Robbins employee directed them to the appropriate storage tank. Accordingly, even if the spillage of chemical constitutes a trespass or a public or private nuisance, Eastman cannot be held liable under Counts Five, Six, and Seven of the Complaint.

### C. *Eastman's Motion to Strike*

Eastman filed a motion to strike certain evidence submitted by Robbins in opposing Eastman's motion. Because the court has granted Eastman's motion for partial summary judgment even considering all of Robbins's evidence, the court will deny Eastman's motion to strike.

### CONCLUSION

Robbins's evidence raises no genuine issues of material fact regarding its claims of liability under CERCLA and common law for environmental contamination. Accordingly, Eastman's motion for partial summary judgment with respect to these claims is due to be granted. Eastman's motion to strike is due to be denied.

An order granting Eastman's motion for summary judgment on Counts One, Two, Three, Four, Five, Six, and Seven and an order denying Eastman's motion to strike will be entered contemporaneously herewith.